**UNITED STATES of America**

v.

**Leon CARMICHAEL, Sr.**

**Crim. Action No. 2:03cr259–T.**

United States District Court, M.D. Alabama, Northern Division.

July 20, 2004.

Amardo Wesley Pitters, A. Wesley Pitters, P.C., Bruce Maddox, Law Office of Bruce Maddox, Ronald Wayne Wise, Law Office of Ronald W. Wise, Stephen Roger Glassroth, The Glassroth Law Firm, PC, Montgomery, AL, Lisa Monet Wayne, Denver, CO, Mary Elizabeth Anthony, Anthony & Pratt LLC, Birmingham, AL, for Leon Carmichael, Sr.

A. Clark Morris, Matthew S. Miner, Stephen P. Feaga, U.S. Attorney's Office, Montgomery, AL, for United States of America.

### ORDER

MYRON H. THOMPSON, District Judge.

The interesting issue presented in this criminal case is whether the court, at the request of the government, may order the defendant to take down an internet website that the government contends is threatening and harassing its witnesses and agents but that the defendant contends is not only a permissible exercise of his First Amendment right to talk about his case but is needed to prepare his defense.

To summarize briefly what follows, defendant Leon Carmichael, Sr. is charged in the United States District Court for the Middle District of Alabama with drug conspiracy and money laundering. Shortly after his arrest, Carmichael set up a website related to this case. Currently before the court is the government's renewed motion for a protective order directing Carmichael to remove his website from the internet on the ground that it is threatening to witnesses and government agents.

The court finds that it has the authority—by virtue of federal statute and its inherent power—to restrict or shut down a website. However, the court cannot grant the government's motion for three reasons grounded in the protections granted to Carmichael by the Bill of Rights. First, even though the website's content taken as a whole is not at the core of the First Amendment, the site constitutes protected speech. Second, the government's proposed protective order would be a prior restraint on Carmichael's protected speech, and the government has not convinced the court that such drastic relief is warranted. Third, the harm posed by the website does not warrant restricting Carmichael's Fifth and Sixth Amendment right to investigate his case by using the website to gather evidence. Accordingly, the government's renewed motion for a protective order will be denied.

### I. BACKGROUND

#### A. The Case

Carmichael was arrested in November 2003 in Montgomery, Alabama, after Gary Wayne George and Robert Patrick Den-

ton—themselves under arrest for marijuana distribution—informed Drug Enforcement Administration (DEA) Task Force Agent R. David DeJohn that Carmichael had employed them to assist in his marijuana-distribution activities. On the day of his arrest, Denton told Agent DeJohn that Carmichael had been expecting a shipment of several hundred pounds of marijuana the previous day and that Carmichael had told him to assist Freddie Williams with re-packaging the marijuana. Denton's information led to a search of Williams's residence later that day; the search turned up eleven duffle bags filled with marijuana.[1] Carmichael was arrested the same day by DEA Agent Thomas Halasz.

As stated, Carmichael is charged with one count of conspiracy to possess marijuana with the intent to distribute, 21 U.S.C.A. §§ 841 & 846, and one count of conspiracy to commit money laundering, 18 U.S.C.A. § 1956(h). The conspiracy count alleges that, since 1993, Carmichael and others have conspired to possess with the intent to distribute 1000 kilograms or more of marijuana. Williams, Carmichael's co-defendant, is also named in the conspiracy count.

### B. The Website

The internet website at issue in this case is www.carmichaelcase.com. At one point, Carmichael argued that the government had not established that he is responsible for the website, but he has not pursued this argument. Evidence submitted by the government shows that the site is registered to Cubie Rae Hayes and an entity known as "Eye For an Eye,"[2] and that Hayes currently works for the Carmichael Center, a business owned by Carmichael.[3] Without question, Carmichael has control over the website.

The website first appeared in December 2003 and first came to the attention of law enforcement in January 2004. The site has gone through roughly three versions. The original version contained a picture of the Montgomery federal courthouse, and it stated that the media had misrepresented the case. The site allowed users to post comments about the case, and it contained links to articles about the case, including an article from a local weekly newspaper that identified Denton by name and listed his home address. The site also included a statement to the effect that Denton had been charged with six felonies.[4]

Sometime in February 2004, the website was changed. The second version showed a picture of the scales of justice on the left side of the page below the words "we are under construction."[5] On the right side of the page, the site displayed the statement, "Look for a new look at this very important case. We will have photos and information on all of the courtroom participants: Defendant, Defense Attorneys, U.S. Attorneys, DEA Agents, Informants."[6] At some point prior to the end of February, this version of the site was amended to include a picture of Carmicha-

---

1. The events leading up to Carmichael's arrest are set out more fully in *United States v. Williams*, 2004 WL 936340 (M.D.Ala.2004) (Thompson, J.).

2. Government's renewed motion, etc., filed April 27, 2004 (govt's renewed motion), exh. A.

3. *Id.*, exh. B (Hayes's resume).

4. Neither party has produced a print-out of the website as it first appeared. This description of the first version of the website is taken from Agent DeJohn's testimony at the March 1, 2004, evidentiary hearing before United States Magistrate Judge Delores Boyd. Tr. of March 1, 2004 evidentiary hearing, pp. 10–16.

5. Govt's renewed motion, exh. C.

6. *Id.*

el and the statement, "Only public records will be published on this site. This includes all participants, in this case, including their names, pictures, and statements."[7]

Sometime around the beginning of April 2004, the website was changed to its current format. At the top of the site is the word "Wanted" in large, red letters, beneath which are the words "Information on these Informants and Agents."[8] Underneath this header are eight boxes, each containing the name of a witness or agent involved in the case and, in parentheses, the word "Agent" or "Informant."[9] The four "informants" listed are Denton, George, Sherry D. Pettis, and Walace Salery.[10] The four "agents" listed are De-John, Halasz, Devin Whittle, and Robert Greenwood.[11] As the site appeared on April 27, 2004, three of the eight boxes contained pictures of the named individuals; the individuals pictured were Denton, Pettis, and George.[12] Currently, a fourth "informant"—Salery—is pictured as well.[13] In the boxes without pictures, the words "Picture Coming" appear in parentheses.[14]

Beneath the eight boxes, this statement appears: "If you have any information about these informants and agents, regardless of how insignificant you may feel it is, Please contact"; the statement is followed by a list of Carmichael's attorneys and their telephone numbers.[15] At one point, only one of Carmichael's attorneys was listed.[16] Currently, four of his attorneys are listed.[17]

This latest version of the site was modified in the middle of April to include, at the bottom of the page, the following language:

"This website, or any posters and advertisements concerning the Carmichael Case, is definitely not an attempt to intimidate or harass any informants or agents, but is simply an attempt to seek information. The Carmichael Case will not be a 'closed door' case.

"Pictures (when available), names and testimonies of informants, agents and witnesses will be on television, on the web site, on the radio and published in newspapers. Carmichael maintains his innocence, and wants the public to know all the facts as well as the participants in this case."[18]

This disclaimer was removed around the end of April.[19] The current version of the website, however, now contains a similarly worded disclaimer.[20] The current version is attached as an appendix to this order.

It also came to the court's attention that the content of the website has appeared at least once as a full-page newspaper advertisement in a local weekly newspaper, the

7. *Id.*

8. *See* govt's renewed motion, exhs. D–G.

9. *See id.*

10. *See id.*

11. *See id.*

12. Govt's renewed motion, exh. G.

13. Carmichael's response in opposition, etc., filed May 12, 2004 (Carmichael's response), exh. 1.

14. *See id.*

15. *See id.*

16. *See* govt's renewed motion, exh. E.

17. *See* Carmichael's response, exh. 1.

18. Govt's renewed motion, exh. F.

19. *See id.*, exh. G.

20. *See* Carmichael's response, exh. 1.

Montgomery Westside Weekly.[21] The advertisement is an exact reproduction of the website as it existed as of April 27, 2004. The advertisement also includes the internet address for the website. Hayes, the apparent creator of the www.carmichael-case.com website, works for the Westside Weekly.[22]

### C. The Government's First Motion for a Protective Order

The government first filed a motion for a protective order on February 4, 2004.[23] The government sought an order restricting Carmichael from posting on his website "[s]tatements concerning the identity, testimony or credibility of prospective witnesses, including informants," "[t]he names, addresses and any other personal information regarding the informants, U.S. Attorneys' [sic], or law enforcement officials involved in this case," "[o]bservations about a prospective witness, informant, U.S. Attorney or law enforcement official's character or activities," and "[s]tatements concerning evidence or arguments in this case, whether or not it is anticipated that such evidence or argument will be used at trial."[24] The government modified its request slightly during a March 1, 2004, evidentiary hearing to limit Carmichael to posting information already in the record and barring him from posting photographs or addresses of any trial participant.[25]

The government's original motion cited 18 U.S.C.A. § 1514 as authority for the court to issue a protective order. Section 1514(b)(1) provides:

"A United States district court, upon motion of the attorney for the Government, shall issue a protective order pro-

hibiting harassment of a victim or witness in a Federal criminal case, if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified victim or witness in a Federal criminal case exists or that such order is necessary to prevent and restrain an offense under section 1512 of this title, other than an offense consisting of misleading conduct, or under section 1513 of this title."

Specifically, the government argued that a protective order under § 1514 was needed to prevent a violation of 18 U.S.C.A. § 1512(b)(1), which provides:

"Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—influence, delay, or prevent the testimony of any person in an official proceeding ... shall be fined under this title or imprisoned not more than ten years, or both."

United States Magistrate Judge Delores Boyd held an evidentiary hearing on the government's first motion on March 1, 2004. The government presented two witnesses in support of its motion. DEA Agent DeJohn testified that he became aware of the website when Pettis called him in January 2004. DeJohn testified that Pettis sounded nervous and upset on the telephone. The government's second witness was DEA Agent Whittle, who testified that, based on his experience, the website could have several consequences harmful to law enforcement: (1) the site could increase the possibility that witnesses could be retaliated against or intim-

---

**21.** *See* Order, filed May 7, 2004.

**22.** Govt's renewed motion, exh. B.

**23.** Motion for a protective order, filed February 4, 2004.

**24.** *Id.* at 5.

**25.** Tr. of March 1, 2004 evidentiary hearing, pp. 65–66.

idated; (2) the site could hinder the government in getting additional witnesses to come forward; and (3) if the site posted photographs of law-enforcement agents, it could hinder their ability to work undercover, and it would increase the possibility that those agents would be retaliated against or harassed.

Judge Boyd denied the government's first motion for the reason that the government did not present sufficient evidence to meet § 1514(b)(1)'s requirements. First, the magistrate judge noted that the statute authorizes the court to issue a protective order to prevent "harassment of an identified victim or witness." However, she found that there was no evidence presented of harassment, defined by the statute as "a course of conduct directed at a specific person that (A) causes substantial emotional distress in such person; and (B) serves no legitimate purpose." 18 U.S.C.A. § 1514(c).

Second, Judge Boyd found that there was insufficient evidence for the court to act under § 1514(b)(1)'s second prong. The statute authorizes the court to act to "prevent and restrain an offense under" § 1512(b)(1), but the magistrate judge found that there was not enough evidence to find the required "intent to ... influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C.A. § 1512(b)(1). Judge Boyd found that the website itself (only the second version was before her) did not evidence the required intent, and she found that the following statement on the web-page could be reasonably construed as negating any criminal intent: "Only public records will be published on this site. This includes all

participants, in this case, including their names, pictures, and statements."

Judge Boyd did note her concerns about the website. She observed that the planned "website publication of photos and information on the prosecuting attorneys appears particularly unsound and otherwise inappropriate." [26] She also noted that "[t]he DEA agents who testified provided good, sound, logical, and even compelling reasons for limiting dissemination of photographs and addresses of informants, other witnesses, and agents involved in narcotics cases." [27] In the end, however, the magistrate judge held that the government had not presented sufficient evidence for the court to act under § 1514(b).

The government did not appeal Judge Boyd's ruling to the district judge.

### D. The Government's Renewed Motion for a Protective Order

With the appearance of the third version of Carmichael's website, the government renewed its motion for a protective order; the renewed motion is being presented directly to a district judge rather than to Judge Boyd. The government seeks "a protective order that directs Defendant to remove his case-related web page from the internet due to its intimidating and obstructive content." [28] In its current motion, the government cites as the court's authority to issue such an order not only § 1514 but also "the Court's inherent authority to control actions of parties, attorneys, and witnesses that impact proceedings before the Court." [29]

In support of its renewed motion, the government has filed DEA reports regarding conversations DEA Agent Whittle has had with Pettis and Denton. According to

---

**26.** Order, filed March 8, 2004, p. 9.

**27.** *Id.*

**28.** Govt's renewed motion at 1.

**29.** *Id.*

the reports, both Pettis and Denton expressed concern to Agent Whittle about their safety. In addition, the government's motion includes references to (1) an incident almost five years ago involving one of Carmichael's attorneys; (2) a threatening remark reportedly made several years ago by Carmichael about a possible witness against him in an unrelated matter; and (3) co-defendant Williams's statement to the effect that his children will be killed if he testifies in this case.

This court held an evidentiary hearing in this matter on May 21, 2004, and the government offered several witnesses. Greg Borland, a supervising DEA agent, testified that if photographs of agents were put up on the site, it could compromise the agents' ability to work undercover and put them in peril and that the website could make it less likely that witnesses will come forward in this case. Agent Borland made clear that he is concerned with the use of photographs on the website, the site's format, and the broad availability of the website. Borland testified that the use of the terms 'wanted' and 'informant' is threatening. 'Informant,' Borland testified, has a bad connotation among criminals and is considered equivalent to 'snitch.'

The government also offered the testimony of two of its witnesses pictured on www.carmichaelcase.com. Pettis testified that she has known Carmichael since 1994 but that she knows of nothing illegal done by Carmichael. She testified that the website has made her fearful of what people might do to her and that she has left Alabama because of her uncertainty; she did not specify who the people are who worry her. Pettis testified on cross-examination that she has not received any threats from Carmichael and that she decided on her own to leave Alabama. She also testified that she had received threatening words; again, she did not specify from whom she had received these words.

Denton testified that the website's appearance—and the newspaper advertisement reproducing the website—has changed his life dramatically. He testified that he is scared to let his children leave his house and that someone approached him in a restaurant and told him that Carmichael was trying to get him killed. Much of Denton's testimony concerned the appearance of his name and address in newspaper articles in the Montgomery Westside Weekly and the Montgomery–Tuskegee Times.

The government offered witnesses who testified about two of the incidents referred to in its motion. DEA Agent Greenwood testified to the statement made by Carmichael's co-defendant Williams that he could not cooperate because, if he did, his children would be killed. DEA Agent J.W. Barnes testified that, in 1997, Carmichael paid the bond for a woman arrested in Mississippi while driving a truck containing 200 pounds of marijuana. According to Barnes, the bondsman told him that Carmichael had called his secretary to ask if he would get his money back if the woman were dead.

Finally, the government offered the testimony of DEA Agent DeJohn to show that an atmosphere of intimidation surrounds this case.[30] DeJohn testified to three witnesses who initially agreed to testify and then decided not to testify. Each of the three witnesses informed the government of his or her decision not to testify after the website was put on the internet; none of the witnesses mentioned the

30. DeJohn provided additional testimony in a deposition taken several days after the court's May 21, 2004, hearing.

webs-site as his or her reason for deciding not to testify.

Carmichael has moved to strike the three references to events unrelated to the website in the government's renewed motion.[31] In addition, Carmichael argues that any protective order would infringe his right to free speech under the First Amendment and his right to present his defense under the Fifth and Sixth Amendments; that the court does not have the inherent authority to issue the proposed protective order; and that the government has not met the evidentiary requirements of § 1514.

Carmichael called one witness at the May 21 evidentiary hearing: Dr. Mark Hickson, a professor of communications at the University of Alabama at Birmingham. Hickson testified that he did not see anything harassing or intimidating about the website, and he characterized the use of the 'wanted poster' format as an attention-getting technique.

## II. OBJECTIONS TO EVIDENCE

Carmichael has moved to strike three sections of the government's motion. This court generally treats motions to strike as notice of the moving party's objection to the evidence. *See, e.g., Norman v. Southern Guar. Ins. Co.,* 191 F.Supp.2d 1321, 1328 (M.D.Ala.2002) (Thompson, J.). The court thus construes Carmichael's motion as an objection to the relevance of three issues raised in the government's motion.

Carmichael first objects to what he characterizes as an unethical attack on one of his attorneys, Stephen R. Glassroth. To lay out the bizarre factual background to this dispute and to describe the contentions of the two sides would be to accord the issue far more significance than it warrants. Suffice it to say that Glassroth's conduct in a case involving a different defendant nearly five years ago is not relevant to this matter.

Carmichael next objects to the government's assertion that, in the past, he has suggested that a potential witness against him might be killed. In its motion, the government recounts how an employee of Carmichael's trucking company was arrested in 1997 while driving a truck containing 200 pounds of marijuana and how Carmichael paid the employee's bond. The government's motion then claims that "[a]fter paying for the bond, [Carmichael] called the bail bondsman, spoke to a clerical worker, and asked if he would get his money back if the [employee] were killed after being released from jail."[32] Carmichael objects that the government has mischaracterized this event.

The court makes the following observation about the government's claim. First, the DEA report from which the government draws its facts does not actually state that Carmichael asked the bondsman whether he would get his money back if his employee "were killed"; rather, the report states that Carmichael "asked what would happen if [the employee] was dead."[33] Agent Barnes testified similarly at the hearing. Second, Carmichael's comment is being introduced via triple hearsay: Barnes heard from the bail bondsman that his secretary told him that Carmichael asked her about what would happen if his employee were dead. The court has serious concerns about the probative value, let alone reliability, of such testimony. Third, the DEA report reveals that before

---

31. Carmichael's response at 1–4.

32. Govt's renewed motion at 8.

33. United States' Notice of Clarification, filed April 28, 2004, Exh. 3, Drug Enforcement Administration Report of Investigation, p. 2.

Carmichael asked if he would get his money back if his employee were dead, he asked whether he would get his money back if the employee disappeared. Read in context, Carmichael's actual question is susceptible to a number of interpretations. Viewed in the worst light, his question suggests that he was considering the economic cost of murdering his employee. Viewed in the most innocent light, Carmichael was merely asking a series of hypothetical questions about the conditions under which he would get his money back. The court will duly weigh these considerations in considering the government's evidence.

Finally, Carmichael takes issue with the government's statement that co-defendant Williams has been threatened to prevent him from testifying. In its motion, the government notes that Williams told Agent Halasz "that if he 'named names' his children would be killed." [34] From this statement, the government concludes that Williams was clearly threatened. Carmichael points out that Williams's statement is not conclusive evidence that a threat was actually made against Williams and, if so, that there is no evidence that he was the one who threatened Williams. Agent Greenwood's testimony confirms that Williams did not say by whom he had been threatened. Carmichael's objections are noted.

## III. DISCUSSION

The government's renewed motion for a protective order presents the court with a conflict between the government's interest in protecting its witnesses and agents in-

volved in a criminal investigation and Carmichael's right to speak about his case and prepare his defense. The government's motion raises three specific questions. First, what is the nature of the court's authority to issue the protective order sought by the government? Second, would the protective order sought by the government impermissibly infringe Carmichael's First Amendment right to freedom of speech? Third, would the order infringe Carmichael's Fifth and Sixth Amendment right to prepare and present a defense in this case?

### A. The Court's Authority to Issue the Protective Order

The court has the authority, under appropriate circumstances, to issue a protective order that would direct a defendant to remove a website from the internet so as to protect the government's witnesses and agents from threats or intimidation. The court's authority derives from the United States Code, 18 U.S.C.A. § 1514(b)(1), and from its inherent authority, *United States v. Noriega*, 917 F.2d 1543, 1548 (11th Cir. 1990); *United States v. Gurney*, 558 F.2d 1202, 1209–1210 (5th Cir.1977).[35]

■ The court's statutory authority is both based on, and limited by, the terms of § 1514(b)(1). Under this provision, which is set forth in full above, the court can issue a protective order if the government proves by a preponderance of the evidence either (1) that "harassment of an identified victim or witness ... exists" or (2) "that such order is necessary to prevent and restrain an offense under" 18 U.S.C.A. § 1512(b)(1).[36]

34. Govt's renewed motion, Exh. J, Drug Enforcement Administration Report of Investigation, p. 1.

35. In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

To establish that "harassment ... exists," the government must prove the existence of the statutory elements of "harassment." "Harassment" is defined as "a course of conduct directed at a specific person that causes substantial emotional distress in such person; and serves no legitimate purpose" and defines "course of conduct" to mean "a series of acts over a period of time, however short, indicating a continuity of purpose." 18 U.S.C.A. § 1514(c). The dictionary definition of harassment similarly emphasizes the continuing or repeated nature of the distressing conduct. Webster's Third New International Dictionary, Unabridged 1031 (1976) ("to vex, trouble, or annoy *continually* or *chronically*") (emphasis added).

The www.carmichaelcase.com website is not harassment as defined by the statute. While the website's continuous presence on the internet could arguably be equivalent to "a series of acts over a period of time," 18 U.S.C.A. § 1514(c)(2), the court cannot find that the website "serves no legitimate purpose." § 1514(c)(1)(B). It may be that the website only barely advances a legitimate purpose, but it cannot be said that it advances "no legitimate purpose." Accordingly, the court finds that a protective order is not warranted under the "harassment" prong of § 1514(b)(1) because the elements of the statute are not met here.[37]

■ Therefore, if the court is going to rely on § 1514, it must find that a protective order is necessary to prevent a violation of § 1512(b)(1). To establish a violation of § 1512(b)(1), which is set forth in part above, the government must prove (1) that Carmichael knowingly intimidated or threatened another person and (2) that he did so with the intent to "influence, delay, or prevent" that person's testimony. *See United States v. Lara,* 181 F.3d 183, 200 (1st Cir.1999); *United States v. Gabriel,* 125 F.3d 89, 104 (2d Cir.1997); *United States v. Johnson,* 903 F.2d 1084, 1087 (7th Cir.1990).[38]

---

36. Section 1514(b)(1) also provides that the court shall issue a protective order if it finds that "such order is necessary to prevent and restrain an offense ... under Section 1513 of [Title 18]." The government, however, has at no point raised this provision as a ground for a protective order in this case.

37. Even if the government established that the statutory definition of "harassment" were met here, the court would still deny the government's motion on the ground that Carmichael's Fifth and Sixth Amendment right to investigate his case by using the website outweighs the government's interest in protecting witnesses and agents from harassment. *See* infra at pp. 1298–1299.

38. The government argues that it should not be required to prove the intent element or that it should be held to a lower standard of proof with respect to the intent element. The government's contention is that, while a rigorous examination of intent is appropriate in a criminal prosecution under § 1512, the court should focus on the effect of the defendant's conduct when applying § 1512 in connection with a motion under § 1514, because § 1514 is preventive.

The court ultimately does not reach § 1512's intent requirement, but it is not persuaded by the government's argument. First, the court cannot see its way around the plain language of § 1512. Section 1514 authorizes the court to act to prevent a violation of § 1512, which in turn requires the government to show that it is the defendant's intent to "influence, delay, or prevent the testimony of any person in an official proceeding." Second, to the extent that the government argues that a lower evidentiary standard should apply because an action under § 1514 is preventive, § 1514 already accounts for that concern by specifying that the government need only show a violation of § 1512 by a preponderance of the evidence. Finally, the intent requirement in § 1512 serves the important purpose of reining in the statute's potentially unconstitutional breadth. *See United States v. Tyler,* 281 F.3d 84, 91 (3d Cir.2002); *United States v. Kelly,* 91 F.Supp.2d 580, 582 (S.D.N.Y.2000).

■ The court's authority to act under § 1512 is, of course, cabined by the United States Constitution. "As a general principle, the First Amendment bars the government from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245, 122 S.Ct. 1389, 1399, 152 L.Ed.2d 403 (2002); *see also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907, 102 S.Ct. 3409, 3422, 73 L.Ed.2d 1215 (1982). Thus, the court may limit or shut down Carmichael's website on the ground that it is a threat under § 1512 only if the site is a constitutionally unprotected 'true threat' and not protected speech. *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam) ("What is a threat must be distinguished from what is constitutionally protected speech."); *United States v. Callahan*, 702 F.2d 964, 966 (11th Cir.1983). The court's authority under § 1512 is also limited by Carmichael's Fifth and Sixth Amendment rights to gather evidence and prepare his defense. *See United States v. Valenzuela–Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982).

The court's inherent authority or discretion to regulate the actions of trial participants is similarly limited by the constitutional rights of the parties. In *Gurney*, upon which the government relies, the United States Court of Appeals for the Eleventh Circuit's strong language about a court's authority to restrict trial participants "despite the fact that such restrictions might affect First Amendment considerations," 558 F.2d at 1210, is best understood as a "more modest assertion[] to the effect that the courtroom setting may provide justifications for placing limits on speech that would not other-

wise exist in the general marketplace." 1 Rodney A. Smolla *Smolla & Nimmer on Freedom of Speech* § 15:42 (2004). Thus, if the website is protected speech, the court can issue the protective order only if the government proves that its interest in protecting its witnesses and agents outweigh's Carmichael's free-speech interest. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683 (1976). In *Gurney*, the Fifth Circuit explicitly recognized that the court's discretion is bounded by the Sixth Amendment. *See Gurney*, 558 F.2d at 1210 ("Sixth Amendment rights of the accused must be protected always").

Thus, before the court can act under either source of its authority (statutory or inherent) it must consider whether the protective order sought by the government can be imposed on Carmichael consistent with the United States Constitution. The court now turns to this inquiry.

### B. First Amendment

Carmichael argues that the protective order sought by the government would infringe his free-speech rights under the First Amendment.[39] The first question is whether Carmichael's website is protected speech. Because threats are not protected by the First Amendment, the court can issue a protective order shutting the site down or otherwise restricting it if the site is a 'true threat.' If the site is protected by the First Amendment, the court can issue the protective order sought by the government only if the government satisfies the constitutional rules for imposing prior restraints on the speech of trial participants.

I.

---

39. "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend.

### 1. Is the Website a 'True Threat'?

■ As stated, 'true threats' are not protected by the First Amendment. *Virginia v. Black,* 538 U.S. 343, 359, 123 S.Ct. 1536, 1547–48, 155 L.Ed.2d 535 (2003); *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 1401, 22 L.Ed.2d 664 (1969) (per curiam). " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black,* 538 U.S. at 359, 123 S.Ct. at 1548. The "prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 360, 123 S.Ct. at 1548 (internal quotations omitted).

*Watts* is the origin of the 'true threat' doctrine. In *Watts,* the petitioner appealed his conviction for violating 18 U.S.C.A. § 871, which prohibits any person from "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States." 394 U.S. at 705–05, 89 S.Ct. at 1400–01. The basis of petitioner's conviction was a statement he made during a 1966 anti-Vietnam War rally on the mall in Washington: "They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706, 89 S.Ct. at 1401.

The Supreme Court, per curiam, reversed on the ground that petitioner's speech was not a threat. After noting that the government's valid, "even overwhelming," interest in the life of the President, the Court wrote:

"Nevertheless, a statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech."

*Id.* at 707, 89 S.Ct. at 1401. "Against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," the Court interpreted § 871 not to reach "the kind of political hyperbole indulged in by petitioner." *Id.* at 708, 89 S.Ct. at 1401. The Court held that the petitioner's speech was not a "true 'threat' " and was thus protected by the First Amendment.

The Supreme Court has not settled on a definition of a 'true threat,' but the United States Court of Appeals for the Eleventh Circuit has:

"A communication is a threat when in its context it would have a reasonable tendency to create apprehension that its originator will act according to its tenor. In other words, the inquiry is whether there was sufficient evidence to prove beyond a reasonable doubt that the defendant intentionally made the statement under such circumstances that a reasonable person would construe them as a serious expression of an intention to inflict bodily harm. Thus, the offending remarks must be measured by an objective standard."

*United States v. Alaboud,* 347 F.3d 1293, 1296–97 (11th Cir.2003) (internal citations, quotations, and alterations omitted). The Eleventh Circuit's objective approach accords with that taken by the majority of the United States Courts of Appeals. *See, e.g., United States v. Hartbarger,* 148 F.3d

777, 782–83 (7th Cir.1998); *United States v. Kosma,* 951 F.2d 549, 556–57 (3d Cir. 1991).

A number of factors are relevant to determine whether speech is a threat proscribable under the First Amendment. First, the court must consider the language itself. *See, e.g., Watts,* 394 U.S. at 708, 89 S.Ct. at 1402 (considering the conditional nature of the threat in the petitioner's speech). Second, the court "must look at the context in which the communication was made to determine if [it] would cause a reasonable person to construe it as a serious intention to inflict bodily harm." *Alaboud,* 347 F.3d at 1297. Third, testimony by the recipient of the communication is relevant to determining whether it is a threat or an act of intimidation. *Id.* at 1298.

### a. The Website Itself

■ The language of Carmichael's website does not make out a threat. There is no explicit threat on the site, and neither the request for information nor the list of Carmichael's attorneys is threatening or intimidating. The statement that "Mr. Carmichael maintains his innocence and wants the public to know all the facts as well as all the participants in this case" is similarly unmenacing.[40] Furthermore, the site actually disclaims any intent to threaten; the site includes the following statement at the bottom of the page: "This web site, or any posters, and advertisements concerning the Carmichael Case, is definitely not an attempt to intimidate or harass any informants or agents, but is simply an attempt to seek information."[41] Indeed, these elements make the site appear to be just what Carmichael maintains it is: another way of gathering information to prepare his defense.

It is instructive to compare this case to another case involving a 'wanted poster.' In *United States v. Khorrami,* 895 F.2d 1186, 1189 (7th Cir.1990), the court affirmed the defendant's conviction for violating 18 U.S.C.A. § 876, which prohibits the mailing of threatening communications. Khorrami mailed to the Jewish National Fund, a non-profit organization that raises money for public projects in Israel, a "poster-like paper that state[d] at its top 'Wanted for crimes against humanity and Palestinians for fifty years.'" 895 F.2d at 1189. The poster featured photographs of then-current Israeli political figures including Yitzhak Shamir and Shimon Peres along with the Israeli President and the mayors of Jerusalem and Tel Aviv, and it also included photographs of the president, executive vice-president, and director of communications of the Jewish National Fund. *Id.* The photographs were disfigured with swastikas and epithets, and the statements "His blood need," "Must be killed," and "Execute now!" were written next to some of the photographs. *Id.* In addition to mailing the 'wanted poster,' Khorrami repeatedly called the Jewish National Fund over a six-month period and left obscene and threatening telephone messages, and he sent another threatening letter to the fund. *Id.* at 1188–90. Applying the same test as the Eleventh Circuit for threats, the *Khorrami* court held that, in light of the defendant's other actions, "there was more than sufficient evidence to support the jury's conclusion that [the defendant's] 'wanted poster' constituted a 'true threat.'" *Id.* at 1193.

Carmichael's website is not nearly as threatening as the 'wanted poster' in *Khorrami.* The www.carmicahaelcase.com site contains no references to killing, execution, or blood; the photographs on the site are

---

40. Carmichael's response, exh. 1.

41. *Id.*

1282

not disfigured, and no epithets appear on the site; nor is there anything on the website otherwise comparable to such references and epithets. Moreover, there is no evidence that Carmichael has called the individuals featured on his site, nor is there evidence that he has sent them threatening letters.

It is true that the term 'informant,' by which the www.carmichaelcase.com site refers to four government witnesses in this case, generally carries a negative connotation. The first sentence of a recent law review article nicely summarizes the word's connotation:

> "To mobsters, he is a 'rat'; to drug dealers, a 'snitch.' To school children, he is a 'tattletale'; to corporate executives, a 'whistle-blower.' To cops, he is an 'informant'; to prosecutors, a 'cooperator.' By whatever name he is known, the person who betrays his associates to the authorities is almost universally reviled. In movies, on television, in literature, the cooperator embodies all that society holds in contempt: he is disloyal, deceitful, greedy, selfish, and weak."

Michael A. Simons, *Retribution for Rats: Cooperation, Punishment, and Atonement,* 56 Vand. L.Rev. 1, 2 (2003). DEA Agent Borland testified similarly that 'informant' is equivalent to the derogatory term 'snitch,' and even Carmichael's counsel admitted during this court's hearing that 'informant' is more than just a synonym for 'witness.'

The First Amendment, however, does not prohibit name-calling. The First Amendment protects "vehement, caustic, and sometimes unpleasantly sharp attacks" as well as language that is "vituperative, abusive, and inexact." *Watts,* 394 U.S. at 708, 89 S.Ct. at 1401–02. Further, the First Amendment protects such speech even when it is designed to embarrass or otherwise coerce another into action.

*NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 910, 102 S.Ct. 3409, 3424, 73 L.Ed.2d 1215 (1982). Thus, "threats of vilification or social ostracism" are protected by the First Amendment and outside the reach of § 1512. *Id.* It is only when speech crosses the line separating insults from 'true threats' that it loses its First Amendment protection. The court cannot find that the www.carmichaelcase.com site—standing alone—crosses that line.

b. Context

■ The court must also consider the context in which the website operates in order to determine whether the reasonable viewer would see it as a threat. *Alaboud,* 347 F.3d at 1297. The importance of context is vividly illustrated by two cases arising under the Freedom of Access to Clinics Entrances Act (FACE), 18 U.S.C.A. § 248. FACE provides criminal penalties for

> "[w]hoever by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services."

18 U.S.C.A. § 248(a)(1). FACE also provides for a private right of action for "[a]ny person aggrieved by reason of the conduct prohibited by subsection (a)." 18 U.S.C.A. § 248(c)(1)(A). These two cases are helpful because they involve statements which surely lie at the outside edge of the definition of 'true threats.'

In *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists,* 290 F.3d 1058 (9th Cir. 2002) (en banc), four doctors who provide abortions—Drs. Hern, Crist, Elizabeth Newhall, and James Newhall—and two

abortion clinics brought a lawsuit under FACE's private cause-of-action provision against the American Coalition of Life Activists, Advocates of Life Ministries, and a number of individuals associated with these two groups. The plaintiffs' claim was that two posters and an internet website produced by the defendants constituted "threat[s] of force" under FACE. A jury found for the plaintiffs and awarded them substantial damages, including nearly $80 million in punitive damages. 290 F.3d at 1066 n. 4. The trial court also permanently enjoined the defendants from publishing or distributing its posters and from providing material to the website. *Id.* at 1066. On appeal, the defendants argued that the posters and website were not 'true threats' and were thus protected by the First Amendment.

Like the www.carmichaelcase.com website, neither the posters nor the website in *Planned Parenthood* expressly threatened the plaintiffs. The first poster, published in January 1995, was captioned "GUILTY," beneath which were the words "OF CRIMES AGAINST HUMANITY." Under the heading "THE DEADLY DOZEN," the poster identified 13 doctors, including three of the plaintiffs, and listed their home addresses. 290 F.3d at 1064–65. At the bottom, the poster bore the legend "ABORTIONIST" in large, bold typeface. *Id.* at 1065. The second poster, released in August 1995, identified one of the plaintiff doctors and bore the word "GUILTY" in large bold letters at the top followed by the words "OF CRIMES AGAINST HUMANITY." *Id.* The poster gave the doctor's home and work address, and it also bore the legend "ABORTIONIST" in large bold type at the bottom. *Id.*

The website at issue was put up on the internet in January 1997. *Id.* It was called the "Nuremberg Files" in reference to the location of the post-World War II Nazi war crimes trial, and it listed information on abortion-providers, judges and politicians, and prominent abortion-rights supporters. *Id.* The website listed the names of approximately 400 individuals and provided the following legend to interpret the font in which each name was listed: "Black font (working); Greyed-out Name (wounded); Strikethrough (fatality)." *Id.* The names of three abortion providers who had been murdered between March 1993 and July 1994—Drs. Gunn, Patterson, and Britton—were struck through. *Id.*

Applying roughly the same standard for determining when speech is a threat that the Eleventh Circuit applies, the United States Court of Appeals for the Ninth Circuit, sitting en banc, held that the two posters and the "Nuremberg Files" website constituted 'true threats' and affirmed the jury's verdict in favor of the plaintiffs. *Id.* at 1085–86. The court's reasoning was based on the history of violence directed against abortion-providers prior to the defendants' creation of the posters and the website. *Id.* at 1079, 1085–86. The court described how in the two years prior to January 1995, when the defendants produced the first poster, three abortion providers—Drs. Gunn, Patterson, and Britton—were killed after they appeared on similar posters which gave information about them and bore headings like "WANTED" and "unWANTED." The court described its reasoning this way:

> "[I]t is use of the 'wanted'-type format in the context of the poster pattern—poster followed by murder—that constitutes the threat. Because of the pattern, a 'wanted'-type poster naming a specific doctor who provides abortions was perceived by physicians, who are providers of reproductive health services, as a serious threat of death or bodily harm. After a 'WANTED' poster on Dr. David Gunn appeared, he was

shot and killed. After a 'WANTED' poster on Dr. George Patterson appeared, he was shot and killed. After a 'WANTED' poster on Dr. John Britton appeared, he was shot and killed. None of these 'WANTED' posters contained threatening language, either. Neither did they identify who would pull the trigger. But knowing this pattern, knowing that unlawful action had followed 'WANTED' posters on Gunn, Patterson and Britton, and knowing that 'wanted'-type posters were intimidating and caused fear of serious harm to those named on them, ACLA published a 'GUILTY' poster in essentially the same format on Dr. Crist and a Deadly Dozen 'GUILTY' poster in similar format naming Dr. Hern, Dr. Elizabeth Newhall and Dr. James Newhall because they perform abortions. Physicians could well believe that ACLA would make good on the threat. One of the other doctors on the Deadly Dozen poster had in fact been shot before the poster was published.... In the context of the poster pattern, the posters were precise in their meaning to those in the relevant community of reproductive health service providers. They were a true threat."

*Id.* at 1085. Thus, even though the defendants were responsible neither for the earlier 'wanted posters' nor the earlier killings, the context created by those posters and killings gave the defendants' posters and website a threatening meaning.

The present case is obviously different because Carmichael's website was not put up in the context of a recent string of murders linked to similar publications. The crucial circumstance for the court in *Planned Parenthood* was the pattern of posters followed by murders that pre-dated the defendants' publication of their posters. The analogous situation in this case would be if there were a history of

witnesses or government agents being threatened or killed after the release of 'wanted-style' posters on which they were pictured. Such a pattern does not exist here, so the case that www.carmichael-case.com is a threat is not in any way as strong as that in *Planned Parenthood.*

This case is not totally dissimilar from *Planned Parenthood,* however. Just as the court in *Planned Parenthood* considered the history of violence against abortion providers, this court considers the history of violence committed against informants in drug-distribution cases generally. A brief search of recent reported decisions in the Federal Reporter reveals numerous cases involving the murder of informants in drug-conspiracy cases. *See, e.g., United States v. Waggoner,* 339 F.3d 915, 916 (9th Cir.2003) (DEA informant murdered by defendant's friends); *United States v. Gadson,* 74 Fed. Appx. 245, 247–248 (4th Cir.2003) (informant who provided evidence that led to seizure of drug shipment murdered by drug defendant); *United States v. Bryce,* 287 F.3d 249, 252 (2d Cir.2002) (confidential informant who assisted investigation of drug conspiracy investigation murdered); *United States v. Thompson,* 286 F.3d 950, 956 (7th Cir. 2002) (informant in drug conspiracy case murdered). This is the broad context in which Carmichael's site exists.

The facts of the present case are similar to those in the cases cited above. Carmichael is accused of heading a far-flung, long-running drug-distribution conspiracy. Denton and George—two of the 'informants' pictured on the site—have admitted to involvement in such a drug conspiracy, and marijuana and firearms have already been seized in this case. *United States v. Williams,* Crim. Action No. 2:03cr259–T, 2004 WL 936340, at *1–3 (M.D.Ala. Apr.8, 2004) (Thompson, J.) (describing results of

search of co-defendant Williams's residence).[42]

Viewed in light of the general history of informants being killed in drug conspiracy cases and the evidence of a drug-conspiracy and other criminal activity in this case, www.carmichaelcase.com looks more like a threat. Indeed it may be that it is *only* this context that gives the site a threatening meaning. To illustrate how much of the website's threatening meaning is derived from the factual context of this case, imagine the same website put up by a defendant in a securities-fraud case. In the context of a white-collar crime prosecution, the same site might be an annoyance, but, absent other circumstances, it would be nearly impossible to conclude that it is a threat.

Nevertheless, it is important to recall that the inquiry here is whether a reasonable person would view Carmichael's *website* as "a serious expression of an intention to inflict bodily harm," *Alaboud*, 347 F.3d 1293 at 1297, not whether the site calls to mind other cases in which harm has come to government informants, not whether it would be reasonable to think that Carmichael would threaten an informant, and not whether Carmichael himself is somehow threatening. Context can help explain the website's meaning, but it is the website that is the focus of the court's inquiry. Although the broad social context makes the case closer, the background facts described above are too general to make the Carmichael case site a 'true threat.'

Neither is the government's evidence offered to show that an atmosphere of intimidation exists enough to conclude that Carmichael's site is a threat. If the court had solid evidence that Carmichael had threatened other witnesses in an unambiguous way, that might create a context in which the court could conclude that his website is reasonably construed as a threat. However, the government's evidence is not solid. The court has already expressed its reservations about the government's evidence regarding Carmichael's alleged threatening remark to the Mississippi bail bondsman's secretary and Williams's alleged statement that his children would be killed if he cooperated with the government. Agent DeJohn's testimony establishes that three potential witnesses who had previously agreed to help the government—Sandra Jones, Shermaine German, and Moses Williams—subsequently decided not to cooperate, and there is some evidence that Carmichael threatened Jones. However, there is no evidence that anyone—much less Carmichael—threatened German, and the only evidence that anyone threatened Williams is his statement to government agents that he was not going let them get him "fucked up."[43] Again, the evidence of an atmosphere of general intimidation is not enough to find that the website is a 'true threat.'

Context was also the determinative factor in *United States v. Hart*, 212 F.3d 1067 (8th Cir.2000), in which the United States Court of Appeals for the Eighth Circuit upheld the defendant's criminal conviction under FACE. Hart, "a self-declared anti-

---

42. Statements at the court's hearing reveal that Carmichael himself is a convicted murderer. These statements, however, also revealed that Carmichael was subsequently pardoned and had his civil rights restored. No evidence was presented regarding the murder for which Carmichael was convicted, that is, whether it was drug-related or had nothing to

do with drugs at all, and no evidence was presented regarding his pardon. The court is thus reluctant to rely heavily on Carmichael's murder conviction in its analysis given the almost complete lack of facts in the record.

43. Deposition of Raymond David DeJohn, p. 17.

abortion activist," rented two Ryder trucks and parked them in the driveways of two abortion clinics in Little Rock, Arkansas. 212 F.3d at 1069. The court described what happened the next day:

"[E]mployees arriving at the clinics were alarmed by the presence of the trucks. Reminded of the catastrophic 1995 bombing of a federal office building in Oklahoma City, Oklahoma, involving a Ryder truck, employees of the clinics feared that the trucks contained bombs. They immediately left the buildings and notified the police. At each clinic, the area was evacuated, and a bomb squad was called in to investigate. The authorities determined, however, that the trucks contained no explosive materials."

*Id.* at 1069–70. Hart was indicted on two counts of violating FACE and was convicted by a jury. *Id.* at 1070.

The Eighth Circuit affirmed Hart's conviction over his argument that "individual cultural inferences and speculation regarding the meaning of the placement of the Ryder trucks and their association with the Oklahoma City bombing do not suffice to render the trucks a 'threat of force.'" *Id.* at 1072. The court cited a number of factors that contributed to an atmosphere in which the Ryder trucks would seem more threatening: abortion clinics are often sites of protests and violence; "the placement of the trucks coincided with a visit to Little Rock from President Clinton"; and "Hart offered no legitimate reason for leaving the trucks." *Id.* The court concluded that "[t]hese circumstances, coupled with the similarity to the well-known events of the Oklahoma City bombing, were reasonably interpreted by clinic staff and police officers as a threat to injury." *Id.* Thus, the court held that a reasonable person would interpret the Ryder trucks in *Hart* as a threat, not because of anything about the trucks themselves, but be-

cause historical events gave them a threatening meaning.

The present case contains an analogue to the Ryder trucks in *Hart:* the 'wanted poster' format. Such posters, of course, call to mind the "Wanted: Dead or Alive" posters of the old American west, and the 'wanted poster' format suggests that the individual pictured must be apprehended or punished and that some kind of reward awaits the person who carries out the apprehension or punishment. The 'wanted poster's' threatening meaning is muted on Carmichael's website by the words "Information on these Informants and Agents," but the dominant image is still the word "Wanted" in large, red font at the top of the page. Thus, just like Hart, Carmichael has chosen a form of expression with a historically threatening connotation.

The 'wanted poster' format is not enough like the Ryder trucks, though, to find that Carmichael's site is a threat. None of the other circumstances cited in *Hart,* or something comparable to them, is present here. Most importantly, while Hart could offer no legitimate reason to park the Ryder trucks where he did, Carmichael has offered a legitimate use for his site, to solicit evidence regarding his case. Further, Carmichael's site explicitly explains its legitimate purpose and disclaims any intent to threaten or harass; no such explanation or disclaimer was present in *Hart.*

The government's strongest argument based on context may not be that the Carmichael site is a direct threat that he will inflict harm on the 'informants' and 'agents,' but that the website is meant to encourage others to inflict harm on them. Agent Borland of the DEA suggested this interpretation when he testified that the website looked to him like a solicitation for others to inflict harm on the witnesses and agents.

The problem with this argument is that implicates the Supreme Court's stringent 'incitement' doctrine. *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969). *Brandenburg* stands for the proposition that, as a general rule, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation." *Id.; see also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (1982) ("mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment"). To fall outside the First Amendment's protection, advocacy of violence must be "directed to inciting or producing imminent lawless action and [be] likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447, 89 S.Ct. at 1829. There is no evidence that Carmichael's site meets the imminency requirement of *Brandenburg.* Indeed, in *Planned Parenthood,* Judge Kozinski in dissent noted that there was so little chance of proving that the posters and website in that case met the imminency requirement in *Brandenburg* that the plaintiffs did not even raise the argument. 290 F.3d at 1092 n. 5 (Kozinski, J., dissenting). Thus, the court cannot proscribe Carmichael's site as constitutionally unprotected advocacy of violence.

Another case comparison is helpful here. In *NAACP v. Claiborne Hardware,* the Supreme Court applied *Brandenburg* in a case involving a threatening speech made in a highly charged environment. *Claiborne* arose out of a boycott of white-owned business in Claiborne County, Mississippi that began in the mid–1960s. *See* 458 U.S. at 898–906, 102 S.Ct. at 3418–22 (factual background). The case reached the Supreme Court in 1982 after the Mississippi Supreme Court affirmed a jury verdict against organizations and individuals involved in planning and implementing the boycott on the basis of common-law malicious interference with business. *Id.* at 894, 102 S.Ct. at 3416. "[T]he basis on which the Mississippi Supreme Court held that the [defendants] were liable for damages was the agreed use of illegal force, violence, and threats." *Id.* at 896 n. 19, 102 S.Ct. at 3417 n. 19.

The evidence in *Claiborne* showed that leaders of the boycott used a variety of tools to urge members of the black community to abide by the boycott. A group of 'store watchers' wrote down the names of persons who violated the boycott, which list was read aloud at NAACP meetings and published in a local newspaper. *Id.* at 903–04, 102 S.Ct. at 3420–21. Furthermore, the trial court identified a number of incidents where persons who did not comply with the boycott were victimized; three of the incidents involved shots being fired at the victims' houses. *Id.* at 904–05, 102 S.Ct. at 3421.

One of the individuals found liable was Charles Evers, the Field Secretary of the NAACP in Mississippi, who played a leadership role in organizing the boycott. Plaintiffs urged that two speeches Evers gave in furtherance of the boycott formed a basis for imposing liability on him. *Id.* at 926–27, 102 S.Ct. at 3433. On April 19, 1969, Evers delivered a speech in which he warned that individuals who did not abide by the boycott would be "disciplined," and he gave a speech two days later at which he said to an audience of black residents of the county: "If we catch any of you going in any of them racist stores, we're going to break your damn necks." *Id.* at 902, 102 S.Ct. at 3420.

Citing *Brandenburg,* the Supreme Court held that "Evers's addresses did not exceed the bounds of protected speech," *id.* at 928, 102 S.Ct. at 3434, and thus he could

not be held liable because of them. The Court wrote that, "[i]f there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence. But any such theory fails for the simple reason that there is no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence." *Id.* at 929, 102 S.Ct. at 3434.

In one important respect, this case is analogous to *Claiborne*. Like Evers, Carmichael has used language with a threatening connotation, and, as with Evers, there is no evidence that he has "authorized, ratified, or directly threatened acts of violence." *Id.* If Evers's literal threat—"If we catch any of you going in any of them racist stores, we're going to break your damn necks," *id.* at 902, 102 S.Ct. at 3420—was not outside the First Amendment's protection, it is hard to see how Carmichael's use of language with at most only non-specific threatening connotations could be unprotected.

Moreover, there was more evidence that Evers's speeches were threats than that Carmichael's site is a threat. In *Claiborne*, there was a history of actual acts of retaliation committed by boycott supporters against people who did not abide by the boycott. Such a history makes it more likely that a reasonable reading of Evers's speeches was that they were meant to create a fear of harm or to incite imminent violence. Here, while there is some evidence that Carmichael may have issued *threats* in the past, there is almost no evidence of actual retaliatory *acts* against witnesses or DEA agents involved in this

case, and certainly no evidence linked to Carmichael or his supporters.[44] If Evers's speeches—containing explicit threats of physical harm and made in a context of actual acts of retaliation—were protected by the First Amendment, then Carmichael's website should similarly be protected by the First Amendment.

■ A final piece of 'context' evidence relevant to determining if the www.carmichaelcase.com website is a threat is the very fact that it is a website posted on the internet. Courts and commentators have noted the unique features of the internet, *see, e.g. Reno v. American Civil Liberties Union*, 521 U.S. 844, 851, 117 S.Ct. 2329, 2334–35, 138 L.Ed.2d 874 (1997); Scott Hammack, *The Internet Loophole: Why Threatening Speech On–Line Requires a Modification of the Courts' Approach to True Threats and Incitement*, 36 Colum. J.L. & Soc. Probs. 65, 81–86 (2002), and a number of commentators have argued that these features make content posted on the internet more likely to be threatening, *see, e.g.,* Hammack, *supra;* Jennifer L. Brenner, *True Threats—A More Appropriate Standard for Analyzing First Amendment Protection and Free Speech When Violence is Perpetuated over the Internet*, 78 N.D. L.Rev. 753, 763–64 (2002). In fact, DEA Agent Borland testified at this court's hearing that one of his concerns about Carmichael's 'wanted poster' is that it is posted on the world-wide web.

That Carmichael's 'wanted poster' is on the internet, however, is not enough to transform it into a 'true threat.' First, notwithstanding the commentary cited above, the Supreme Court has held that speech on the internet is subject to no

---

**44.** The only evidence regarding an actual act of retaliation against any witness or agent in this case came from Denton, who testified that his house was broken into shortly after he agreed to be a witness in this case. Denton interpreted the break-in as a threat. The circumstances of the break-in may be suspicious, but there is no evidence that Carmichael had anything to do with it.

greater or lesser constitutional protection than speech in more traditional media. *Reno*, 521 U.S. at 870, 117 S.Ct. at 2344. Second, the general rule in the case law is that speech that is broadcast to a broad audience is less likely to be a 'true threat,' not more. *United States v. Bellrichard*, 994 F.2d 1318, 1321 (8th Cir.1993) ("correspondence . . . delivered to a person at home or at work is somewhat more likely to be taken by the recipient as a threat than is an oral statement made at a public gathering"); *Planned Parenthood*, 290 F.3d at 1099 (Kozinski, J., dissenting) ("[S]tatements communicated directly to the target are much more likely to be true threats than those . . . communicated as part of a public protest."). Thus, to the extent that the government's concern is that Carmichael's website will be seen by a lot of people, that fact makes the site look less like a 'true threat,' not more.

### c. Testimony of Alleged Victims

■ The court also considers the testimony of Denton and Pettis, both of whom are featured on the website as 'informants.' *Alaboud*, 347 F.3d at 1298. Pettis testified that Carmichael's site made her so fearful that she left Alabama, although she did not specify of whom she was afraid. Denton testified that the site changed his life dramatically, making him afraid to let his children outside. Evidence submitted by the government indicates that Denton and Pettis reported feeling threatened to DEA Agent Devin Whittle in the beginning of April. Pettis and Denton's testimony is certainly some evidence that the www.carmichaelcase.com website is a threat.

Testimony by government witnesses and by Pettis and Denton themselves, however, suggests that there may be other causes of Pettis and Denton's fear. First, the government offered evidence of other potential witnesses who chose not to cooperate to show an atmosphere of intimidation surrounding this case. To the extent that there is a general atmosphere of intimidation, however, it is less likely that it is the www.carmichaelcase.com website that is worrying Denton and Pettis. Indeed it seems likely in any big drug-conspiracy case like this that witnesses would be anxious and possibly afraid. Second, Denton's testimony indicated that much of his concern is related to the appearance of his name and address in two newspaper articles which were almost completely unrelated to the website.

The court does not find Agent DeJohn's testimony about the other three witnesses—German, Williams, and Jones—to be indicative that the website is a threat. None of these three would-be witnesses said that his or her decision not to testify had anything to do with the site. There is some evidence that German felt threatened by the site; after Agent DeJohn showed him a print-out of the web-page, he reported feeling concerned, and he wrote to DeJohn the next day to say that he did not want to cooperate with the government. However, while Jones and Williams informed agents of their decision not to testify after the site was posted, that fact is not sufficient for the court to conclude that their decisions were related to the website.

The court finds the testimony of the various DEA agents even less probative of whether the website amounts to a threat. The agents' testimony largely focused on their belief that Carmichael's website could compromise agents' safety in future investigations or compromise agents' ability to work undercover. This is not evidence that the site is a threat, however. Moreover, in considering the testimony of the DEA agents—and Pettis and Denton—the court must keep in mind that the Eleventh Circuit's standard is an objective

one. *Alaboud,* 347 F.3d at 1296–97. Thus, the testimony of witnesses and agents pictured on the site is persuasive, but it is not determinative.

■ Based on all of the above factors and the evidence presented, the court holds that Carmichael's website is not a 'true threat' and is thus protected by the First Amendment.

The court adds that, while Carmichael's site is protected, not all of its content is at the heart of the First Amendment. To be sure, Carmichael's expressed intent to publicize his trial and his statement of innocence implicate weighty First Amendment concerns. *See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 605–06, 102 S.Ct. 2613, 2619–20, 73 L.Ed.2d 248 (1982) (describing importance of public scrutiny of criminal trials); *United States v. Ford,* 830 F.2d 596, 599 (6th Cir.1987) ("The accused has a First Amendment right to reply publicly to the prosecutor's charges, and the public has a right to hear that reply.") (internal quotation omitted). Furthermore, to the extent that Carmichael's website is a criticism of the government's prosecution of him, it is surely core First Amendment speech. *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1034, 111 S.Ct. 2720, 2724, 115 L.Ed.2d 888 (1991) (Kennedy, J.) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.").

However, other parts of the site are further from the core of the First Amendment. Carmichael's request for information about his case, the list of his attorneys' names and telephone numbers, and the names and photographs of the witness and government agents are not political advocacy, *cf. Watts,* 394 U.S. at 708, 89 S.Ct. at 1401–02, and do not even speak to public affairs, *cf. Claiborne,* 458 U.S. at 913, 102 S.Ct. at 3425 ("expression on pub-

lic issues has always rested on the highest rung of the hierarchy of First Amendment values"), much less to "a matter of current moral and political importance." *Planned Parenthood,* 290 F.3d at 1102 (Berzon, J., dissenting). The court thus finds that Carmichael's First Amendment interest is not particularly strong.

Nonetheless, speech is presumptively protected by the First Amendment. *Free Speech Coalition,* 535 U.S. at 245, 122 S.Ct. at 1399. The burden is on the government to show that Carmichael's website is within one of the narrow categories of unprotected speech. This the government has not done. Because the court holds that the website is not a 'true threat,' it is outside of the reach of § 1512, and the court cannot grant the government's motion on that ground.

### 2. Is the Protective Order a Valid Prior Restraint?

The fact that Carmichael's website is protected speech does not end the court's First Amendment inquiry. Under some circumstances, First Amendment rights must give way during a criminal proceeding in order to preserve a fair trial. *See Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1075, 111 S.Ct. 2720, 2745, 115 L.Ed.2d 888 (1991); *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell,* 384 U.S. 333, 350–51, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966). To determine whether Carmichael's speech may be restricted, the court must answer two questions. First, what is the appropriate legal standard against which to evaluate the government's proposed protective order? Second, under that standard, is the protective order warranted?

#### a. Legal Standard

■ The government asks this court to impose "a protective order that directs

Defendant to remove his case-related web page from the internet due to its intimidating and obstructive content."[45] The government has suggested that it would be satisfied with an order limiting Carmichael to posting information already in the record and prohibiting him from posting photographs or personal information about witnesses and agents.

"An order that prohibits the utterance or publication of particular information or commentary imposes a 'prior restraint' on speech." *United States v. Salameh,* 992 F.2d 445, 446 (2d Cir.1993). More specifically, a trial court's order that prohibits or limits the speech of lawyers or parties before the court, a so-called 'gag order,' is a prior restraint. *See, e.g., United States v. Brown,* 218 F.3d 415, 424 (5th Cir.2000) (order prohibiting parties, lawyers, and potential witnesses from making extrajudicial statements to media treated as prior restraint); *Levine v. United States District Court,* 764 F.2d 590, 595 (9th Cir.1985). Because the protective order sought by the government would prohibit Carmichael from publishing particular content on his website, the court treats the proposed order as a prior restraint.

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976). Indeed, the Supreme Court has written that "it has been generally, if not universally, considered that it is the chief purpose of [the First Amendment] to prevent previous restraints upon publication." *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 713–14, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931). Thus, "[a]ny prior restraint on

expression comes … with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971) (internal quotation omitted).

The exercise of First Amendment rights, however, can sometimes imperil the administration of fair criminal trials. "Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by 'impartial' jurors, and an outcome affected by extrajudicial statements would violate that fundamental right." *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1075, 111 S.Ct. 2720, 2745, 115 L.Ed.2d 888 (1991); *see also Patterson v. People of the State of Colorado ex rel. Attorney General,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907) (Holmes, J.) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."). "Due process requires that the accused receive a fair trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused." *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966).

The fact that it is the government that seeks a fair trial in this matter does not change the court's analysis. While the Sixth Amendment does not explicitly protect the government, the government still has a strong interest in a fair trial.[46] *Le-*

---

**45.** Govt's renewed motion at 1.

**46.** "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public

trial, by an impartial jury … and to be informed of the nature and cause of the accusation; to be confronted with the witnesses

*vine,* 764 F.2d at 596–97; *United States v. Tijerina,* 412 F.2d 661, 666 (10th Cir.1969) ("The public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect fair trials designed to end in just judgments.") (internal quotation omitted). Thus, the court "must consider the fundamental interest of the government and the public in insuring the integrity of the judicial process. Society has the right to expect that the judicial system will be fair and impartial to all who come before it." *Levine,* 764 F.2d at 596–97.

Two Supreme Court cases establish relevant principles for striking the balance between free-speech rights, on the one hand, and the need for a fair trial, on the other. In *Nebraska Press Ass'n,* the Supreme Court struck down a 'gag order' issued in a murder trial, in which the defendant was accused of killing six members of a family in the small community in Nebraska where the trial was taking place. The trial court found "because of the nature of the crimes charged in the complaint that there is a clear and present danger that pre-trial publicity could impinge upon the defendant's right to a fair trial." 427 U.S. at 543, 96 S.Ct. at 2795. The trial court's order was directed at the media, and it prohibited the press from reporting on five specific subjects, including an alleged confession and statements made by the defendant and the contents of a note written by the defendant. *Id.*

After noting the presumption against prior restraints, the Court described its task as determining "whether ... 'the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " *Id.* at 562, 96 S.Ct. at 2804 (quoting

*United States v. Dennis,* 183 F.2d 201, 212 (2d Cir.1950) (Hand, J.)). The Court listed four factors as relevant to making this determination: "the nature and extent of pretrial news coverage"; "whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity"; "how effectively a restraining order would operate to prevent the threatened danger"; and "the precise terms of the restraining order." *Id.* Applying these factors, the Court held that the trial court's findings did not support imposition of the gag order against the media. *Id.* at 570, 96 S.Ct. at 2808.

In *Gentile,* the Supreme Court considered the constitutionality of Nevada's rule that prohibits an attorney from making extrajudicial statements that have "a substantial likelihood of materially prejudicing an adjudicative proceeding." 501 U.S. at 1033, 111 S.Ct. at 2723 (quoting Nevada Supreme Court Rules, Rule 177(1)). Following his client's indictment, Gentile gave a press conference in which he made statements to the effect that the evidence would demonstrate his client's innocence, that the likely culprit was a police officer, and that the purported victims were not credible. *Id.* at 1045, 111 S.Ct. at 2729. Gentile gave the press conference in the belief that he was within Rule 177's 'safe harbor provision,' which lists a number of topics about which an attorney can speak publically. *Id.* at 1044, 111 S.Ct. at 2729. While his client was found innocent, Gentile was found to have violated Rule 177 and was disciplined, a decision upheld by the Nevada Supreme Court. *Id.* at 1033, 111 S.Ct. at 2723. The United States Supreme Court, by a 5–4 margin, held that the 'safe harbor provision' in Rule 177 was void for vagueness and reversed. *Id.* at 1038, 111 S.Ct. at 2731.

---

against him; to have compulsory process for obtaining witnesses in his favor, and to have

the Assistance of Counsel for his defence." U.S. Const. amend. VI.

A different five-justice majority separately upheld Nevada's use of the "substantial likelihood" standard. *Id.* at 1075, 111 S.Ct. at 2745. Gentile argued that the more rigorous "clear and present danger" standard applied to restrictions on the media in *Nebraska Press Ass'n* should apply to restrictions on an attorney's speech. Chief Justice Rehnquist, however, concluded that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press." *Id.* at 1074, 111 S.Ct. at 2744. The Chief Justice concluded that "the 'substantial likelihood of material prejudice' standard constitutes a constitutionally permissible balance between the First Amendment rights of attorneys in pending cases and the State's interest in fair trials." *Id.* at 1075, 111 S.Ct. at 2745.

Neither *Nebraska Press Ass'n* nor *Gentile* provides a clear rule to apply in this case. *Nebraska Press Ass'n* considered a 'gag order' issued to the media, and *Gentile* did not consider a 'gag order' at all. Neither case is on all fours with the facts of this case. Furthermore, while the Supreme Court in *Gentile* approved the use of the "substantial likelihood" standard, it did not compel the use of that standard. Put another way, the Court held that the "clear and present" danger standard is not required, but it did not hold that it is prohibited.

The Courts of Appeals have heard First Amendment challenges to more analogous 'gag orders' issued to attorneys and parties. There is broad agreement among the circuits about two relevant factors that trial courts must consider before issuing such an order. First, the court must consider whether the requested order is narrowly tailored. *E.g., Salameh,* 992 F.2d at 447; *United States v. Ford,* 830 F.2d 596, 600 (6th Cir.1987); *Levine,* 764 at 595; *see*

*also Nebraska Press Ass'n,* 427 U.S. at 567, 96 S.Ct. at 2807. Second, the court must consider whether less burdensome alternatives would achieve the government's objective. *Ford,* 830 F.2d at 600; *Levine,* 764 F.2d at 595; *see also Nebraska Press Ass'n,* 427 U.S. at 567, 96 S.Ct. at 2807.

A three-way circuit split exists with respect to the third, and most important, factor to be considered: the threshold standard for imposing a prior restraint. *See Brown,* 218 F.3d at 426–27 (noting circuit split). The United States Courts of Appeals for the Sixth, Seventh, and Ninth Circuits have held that, before the court may issue an order restricting the speech of trial participants, it must find that the speech at issue presents a "clear and present danger" or a "serious and imminent threat" to a fair trial. *See Ford,* 830 F.2d at 598, 600; *Levine,* 764 F.2d at 595; *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 249 (7th Cir.1975). The Courts of Appeals for the Third and Fifth Circuits have adopted the "substantial likelihood of material prejudice" standard. *United States v. Scarfo,* 263 F.3d 80, 94 (3d Cir. 2001); *Brown,* 218 F.3d at 427. The Fourth and Tenth Circuits have held that the appropriate standard is "reasonable likelihood" of prejudice. *In re Russell,* 726 F.2d 1007, 1010 (4th Cir.1984); *United States v. Tijerina,* 412 F.2d 661, 666 (10th Cir.1969). The Eleventh Circuit has not addressed this issue. *See United States v. Scrushy,* 2004 WL 848221, at *2 (N.D.Ala. 2004) (Bowdre, J.).

The present case is different from all but one of the above-cited cases because the restraint of speech requested by the government would fall not on both sides equally but on the defendant alone. *See, e.g., Brown,* 218 F.3d at 418–19; *Levine,* 764 F.2d at 593; *Russell,* 726 F.2d at 1008; *Tijerina,* 412 F.2d at 663 n. 1. The only

analogous case is *Ford*, in which the Sixth Circuit applied the "clear and present danger" standard to strike down a 'gag order' applicable only to the defendant, a sitting United States Congressman. 830 F.2d at 597.[47]

The fact that the protective order in this case would burden only the defense calls for a higher threshold standard of proof. Even the wealthiest of criminal defendants is at a substantial disadvantage compared to the government. As the Sixth Circuit wrote in *Ford*, "[a] criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of the media attention focused on him." 830 F.2d at 599. In light of this imbalance of power, the criminal defendant should have some leeway in addressing the public, and, at the very least, should not be more limited than the government. Accordingly, the court finds that the "serious and imminent threat" standard is appropriate in this case.

This case is also different from most of the 'gag order' cases because the restraint would apply to Carmichael himself and not to his attorneys. Thus, the Supreme Court's conclusion in *Gentile* that attorneys are subject to greater restrictions on their speech is inapposite. In *Gentile*, the court gave a number of reasons for its conclusion that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than established for the regulation of the press." 501 U.S. at 1074, 111 S.Ct. at 2744. The court cited the fact that States

have historically regulated admission to the bar and exercised authority to discipline attorneys; the fact that attorneys have access to non-public information and are viewed as authoritative, both of which pose a greater potential risk to the fairness of a trial; and the fact that attorneys are officers of the court. *Id.* at 1066, 1074, 111 S.Ct. at 2740, 2744–45. These reasons, however, do not apply to a criminal defendant. Thus, the court is not persuaded by *Gentile* that a lower threshold of proof is appropriate under these factual circumstances.

After considering the above, the court holds that it cannot issue the protective order sought by the United States unless (1) Carmichael's website poses a serious and imminent risk to the court's ability to conduct a fair trial, (2) the proposed protective order is narrowly tailored, (3) alternatives to the protective order would not be effective, and (4) the order would be effective in achieving the government's objective.

"This analysis must acknowledge the quality of [F]irst [A]mendment interests which are threatened by the restraints at issue." *United States v. Lehder–Rivas*, 669 F.Supp. 1563, 1567 (M.D.Fla.1987). "Free speech rights reach their zenith when the benefits enure to the public," but "[t]he barest minimum of free speech rights are involved" when the speech's benefit runs only to the speaker. *Id.* As discussed above, Carmichael's website touches both on issues of public concern

---

47. The fact that the protective order would apply only to Carmichael also distinguishes this case from *United States v. Scrushy*, 2004 WL 848221, at * 4 (N.D.Ala.2004), in which Judge Bowdre adopted the "substantial likelihood" standard for determining when a protective order is properly imposed on the parties. Not only did the protective order in *Scrushy* apply to both the defendant and the government, but the parties jointly moved for the protective order. *Scrushy*, 2004 WL 848221, at * 1. In such a case there is less need for the court to vigorously investigate the government's asserted need for a speech-restrictive order.

and on issues of benefit only to him. The court keeps this in mind.

### b. Application

The government has raised two types of concerns about Carmichael's website that it believes warrant the imposition of the protective order. First, the government argues that the website could taint potential jurors. Second, the government argues that the site poses a threat to its witnesses and agents.

### i. Jury Pool

■ The government's proposed protective order is not the least restrictive means for addressing the possibility that www.carmichaelcase.com will taint the jury pool. Two of the alternatives to 'gag orders' posed by the Supreme Court in *Nebraska Press Ass'n* are "searching questioning of potential jurors" and "the use of emphatic and clear instructions" to the jury. 427 U.S. at 564, 96 S.Ct. at 2805. "[S]earching questioning" of potential jury members about whether they have viewed Carmichael's website—either on the internet or as a newspaper advertisement—combined with an "emphatic and clear instruction[ ]" that empaneled jury members are not to view the site during the trial will address the government's concern with far less imposition on First Amendment freedoms.

The nature of Carmichael's site distinguishes this case from cases involving 'gag orders' directed against general pre-trial publicity. *See, e.g., Brown*, 218 F.3d at 431; *Levine*, 764 F.2d at 599–600. While it might be unrealistic to think that voir-dire questions and instructions to the jury can adequately counter the "increasingly widespread media coverage of criminal trials," *Brown*, 218 F.3d at 431 (quoting *Gentile*, 501 U.S. at 1075, 111 S.Ct. at 2745), that is not at issue here. Carmichael's

website is unique, so potential jurors will remember if they have seen it or heard about it. Furthermore, it is unlikely jurors will come across the site by accident, so an instruction to avoid the site should be effective. Accordingly, the restriction on speech proposed by the government is not justified by its concern about a tainted jury.

### ii. Witnesses and Agents

■ The government's asserted interest with respect to its witnesses and agents is different from the fair trial interests typically asserted in support of 'gag orders.' In *Sheppard, Nebraska Press Ass'n,* and *Gentile,* the Court held that speech could be restricted to protect the fundamental right to a trial by impartial jurors. Here, the government is concerned that Carmichael's website will result in harm to the witnesses pictured on the site and that the site will deter witnesses from coming forward in this case and future cases. The government is also concerned that the site could lead to harm to its agents and that it could make it more difficult for the agents to work undercover in the future. Nonetheless, the government has a valid interest in protecting witnesses and agents and encouraging witnesses to come forward.[48]

The government's protective order is not necessary to prevent a serious and imminent risk of either harm to its witnesses or deterring future witnesses from cooperating with the government. The court recognizes that Robert Denton and Pettis are uncomfortable with their names and photographs appearing on the website; that is understandable. However, there is insufficient evidence to find that the site poses an actual risk to Denton or Pettis. Furthermore, as discussed above, the court finds it likely that the anxiety felt by both Denton

---

48. *See infra,* p. 1298.

and Pettis is the result of participating as witnesses in this case (which has been, and most certainly will continue to be, attended by much publicity) and not a result of the website.

The government's evidence in support of its claim that the site will deter witnesses from cooperating in this case is scant. Agent DeJohn testified that three witnesses who initially expressed interest in cooperating subsequently decided not to cooperate; yet, as discussed above, it is only with respect to one witness—German—that the evidence supports the claim that he was influenced by Carmichael's site. Even then, there is only weak circumstantial evidence that German decided not to testify because of the website. There is no evidence that Jones or Williams was scared off by the site. There is also no evidence to support the government's contention that the site could have a deterrent effect on future witnesses.

Similarly, there is insufficient evidence to conclude that the website poses a serious and imminent risk to the safety of government agents or to their future work as undercover officers. As discussed above, most of the agents' testimony focused on the danger that would result from their photographs appearing on the website, and no such pictures are currently on the site. More significantly, the DEA agents who testified all did so in person in open court as they have done in other cases. This fact alone calls into question the extent to which their names and faces must be jealously guarded to protect their safety.

For the above reasons, the court is not convinced that the imposition on Carmichael's First Amendment interests—minimal though they may be—that would result from the government's proposed protective order is warranted by the evidence. In other words, while the court has the inherent authority to issue such an order, it will not do so in this case. Accordingly, the government's renewed motion for a protective order will be denied.

## C. Fifth and Sixth Amendments

Carmichael also contends that the protective order sought by the government would infringe his right to a fair trial and his right to present a defense, rights protected by the Fifth[49] and Sixth Amendments.[50]

### 1. Carmichael's Fifth and Sixth Amendment Interests

■ "Whether rooted in the Due Process Clause ... or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citations omitted). Here, Carmichael argues that the protective order requested by the government would step on his right to present a complete defense by preventing him from using his website to investigate his case.

Carmichael's interest in investigating his case sounds in the rights protected by the Sixth Amendment's Compulsory Process Clause. The Compulsory Process Clause

---

49. "No person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

50. "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

protects a criminal defendant's right to call witnesses who can offer material testimony. *Washington v. Texas,* 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). A defendant's Compulsory Process Clause rights can be offended when the government arbitrarily prevents him from calling such a witness, *id.,* when the government intervenes to deport such a witness, *United States v. Valenzuela–Bernal,* 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982), or when a court denies a defendant a reasonable continuance for the purpose of obtaining such a witness, *Dickerson v. Alabama,* 667 F.2d 1364, 1370 (11th Cir.1982). The Compulsory Process Clause encompasses more than the right to call witnesses, though.

"The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words: 'The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.' "

*Taylor v. Illinois,* 484 U.S. 400, 409, 108 S.Ct. 646, 653, 98 L.Ed.2d 798 (1988) (quoting *Washington,* 388 U.S. at 19, 87 S.Ct. at 1923 (1967)).

Carmichael also has a Fifth Amendment Due Process Clause interest in evidence that is material to his guilt or innocence. *See Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (government must inform the defendant if it knows that one of its witnesses has perjured himself); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963) ("The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment."); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (government must disclose promises of leniency it makes to its witnesses where such promises are material to the defendant's case).

The Supreme Court has also recognized a criminal defendant's interest in obtaining information about confidential informants. In *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957), the Court wrote that the government generally has the "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." However, the Court wrote, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." 353 U.S. at 60, 77 S.Ct. at 628.[51]

**51.** "While *Roviaro* was not decided on the basis of constitutional claims, its subsequent affirmation in *McCray v. Illinois,* 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), where both due process and confrontation claims were considered by the Court, suggests that Roviaro would not have been decided differently if those claims had actually been called to the Court's attention." *Valenzuela–Bernal,* 458 U.S. at 870, 102 S.Ct. at 3448.

None of the cases cited above expressly stands for the proposition that a criminal defendant has a right to investigate his case. However, the rules elucidated in these cases strongly imply that a criminal defendant has a right protected by the Fifth and Sixth Amendments to look for material evidence and witnesses. Just as the right to compel witnesses' presence would be meaningless without the right to present that testimony to the court, *Taylor*, 484 U.S. at 409, 108 S.Ct. at 653, so too would the right to present witnesses be meaningless without the right to conduct an investigation in order to find witnesses to present. Similarly, it would be anomalous to hold that a criminal defendant— whose due-process interest in exculpatory evidence is so strong as to require the government to turn such evidence over even when he has not requested it, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976)—has no due-process interest in investigating his case to uncover exculpatory evidence on his own. Finally, the defendant's interest in obtaining the name of a confidential informant under *Roviaro* would surely be significantly less meaningful if he could not use the name to conduct an investigation.

The constitutional significance of pretrial investigation is illustrated by the case law interpreting the Sixth Amendment's guarantee of a right to counsel. Criminal defendants generally have the right to effective assistance of counsel as a means to protect their broader right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 684–86, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). This right of the defendant's imposes, in turn, a duty on the part of counsel to perform a reasonable investigation. *Id.* at 691, 104 S.Ct. at 2066. The court is not suggesting that to prevent Carmichael from maintaining his website would deny him his right to effective assistance of counsel; rather, the court cites to *Strickland* to underscore the importance that investigation plays in the protection of a criminal defendant's fair-trial rights. The court thus concludes that the protective order sought by the government would infringe Carmichael's Fifth and Sixth Amendment rights.

### 2. The Government's Interest

The government has a cognizable interest here as well, of course, in protecting its witnesses and agents. The Supreme Court has recognized the government's interest in protecting witnesses who come forward to testify in criminal trials, which advances the public's interest in effective law enforcement by encouraging future witnesses to come forward. *Roviaro*, 353 U.S. at 59, 77 S.Ct. at 627. The Supreme Court has also recognized the government's valid interest in the safety of its agents and officers. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 23, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). More specifically, a line of cases concerning the propriety of closing trials to the public recognizes that the government has an interest in keeping its undercover agents' identities secret and in protecting their safety. *See Brown v. Kuhlmann*, 142 F.3d 529, 537–38 (2d Cir. 1998); *Ayala v. Speckard*, 131 F.3d 62, 72 (2d Cir.1997) (en banc).

### 3. Balancing

■ No ready-made test exists for balancing a defendant's fair-trial rights against the government's interest in protecting its witnesses and agents in the context of a government request to foreclose a defendant's means of investigation. However, from the above case law, a number of factors emerge as relevant.

First, the court must consider the likelihood that Carmichael's website will produce evidence. In *Dickerson*, the Eleventh Circuit cited the probability of procuring the witness's testimony within

a reasonable time as one relevant factor in determining whether the denial of a continuance to find a witness violates a defendant's Sixth Amendment rights. 667 F.2d at 1370. A similar inquiry makes sense in this case; Carmichael has a right to investigate his case, but that right will give way if his investigation is likely to be fruitless. Second, the court has to consider the likely materiality of any evidence that will be turned up by the website. In all of the above cases, the key limit on the defendant's right to obtain witnesses or to obtain evidence from the government is materiality. *See, e.g., Valenzuela–Bernal,* 458 U.S. at 873, 102 S.Ct. at 3449; *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196–97; *Roviaro,* 353 U.S. at 60, 77 S.Ct. at 628. Third, the court must consider the government's interest in protecting its witnesses and agents. *Roviaro,* 353 U.S. at 59, 77 S.Ct. at 627.

a. Likelihood of Producing Evidence

Some elements of Carmichael's site are closely analogous to familiar and time-tested investigative techniques. For example, the use of photographs and names of witnesses as a way to gather evidence in a criminal investigation is well-established. Agent Borland testified that DEA agents regularly look for information during investigations by showing photographs of the people under investigation. The idea, presumably, is to gather impeachment evidence about the individuals. The more general request for information on the website is also a familiar technique. Thus, it would not be surprising if an attorney or private investigator working for Carmicha-

el took the same photographs that are on the website and went door-to-door asking for information. Such an investigative tactic might well produce relevant evidence about the individuals pictured or about the case generally.

The fact that Carmichael is using an internet website does not necessarily make this tactic less likely to produce evidence. Indeed, a number of federal investigative agencies put 'wanted posters' accompanied by requests for information on their websites.[52] The use of a website would be particularly useful for a defendant with few resources; they are relatively inexpensive to produce and can reach a wide audience.

That being said, the court has some difficulty finding that Carmichael's webpage will produce evidence. First, the site is virtually impossible to find on the internet without knowing the exact internet address. A "Google" search for "Carmichael case," "Leon Carmichael," and the names of the witnesses and agents pictured on the site does not produce the site. This means that it is less likely that a person previously unknown to Carmichael with information about his case will see the site.[53] The newspaper advertisement featuring the website probably drew viewers to the site, however, and, it must be noted, the government's efforts to shut the site down, and the media coverage thereof, probably drew yet more viewers. Second, the www.carmichaelcase.com site does not include a way to post information or send an email with information. This too makes it less likely that the site will actually

---

52. *See, e.g.,* Federal Bureau of Investigation, Most Wanted, *at* http://www.fbi.gov/mostwant.htm (last visited June 15, 2004); Drug Enforcement Administration, DEA Fugitives, New Orleans Fugitives, *at* http://www.dea.gov/fugitives/orleans/orl-list.htm (last visited June 15, 2004).

53. This fact also casts a doubt on the utility of the 'wanted poster' format as a means to get the viewer's attention; the only people who will see the site are those already interested enough to type in the internet address.

result in evidence or information about the site.

### b.  Materiality

Carmichael's claim here rests on his right to look for evidence that he does not already have and witnesses he has not already interviewed; thus it will be difficult for him to articulate how his website will produce material evidence.  Accordingly, in assessing the likely materiality of any evidence or testimony that Carmichael could uncover with his website, the court applies a less rigorous test for materiality. See *Valenzuela–Bernal,* 458 U.S. at 870, 102 S.Ct. at 3448.

Because Carmichael is looking for information about particular individuals—'informants' and 'agents'—the relevant factors in the *Roviaro* line of cases are a useful way of assessing materiality.  In *Roviaro,* the Supreme Court held that the government's privilege to withhold the identity of informants must give way if "the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause."  353 U.S. at 60, 77 S.Ct. at 628. The Eleventh Circuit has identified two factors useful for determining the relevance of an informant's identity: "the extent of the informant's participation in the criminal activity" and "the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant." *United States v. Tenorio–Angel,* 756 F.2d 1505, 1509 (11th Cir.1985).  Although the court is not aware of Carmichael's asserted defense, these factors are nonetheless useful for determining whether any information that could result from the Carmichael case web-page would be material to his defense.

The court has no basis for determining "the extent of [Pettis's and Salery's] participation in the criminal activity," *Teno-*

*rio–Angel,* 756 F.2d at 1509, and thus has no way of deciding the extent to which information about them would be material to Carmichael's defense.  The court has heard nothing about Salery, and Pettis's testimony at this court's hearing revealed nothing about her role in the offense.  In fact, Pettis stated that she knows of nothing illegal done by Carmichael.

The court is familiar with Denton and George from Carmichael and his co-defendant Freddie Williams's motions to suppress evidence. *United States v. Williams,* Crim. Action No. 2:03cr259–T, 2004 WL 936340, at *1–3 (M.D.Ala. Apr.8, 2004) (Thompson, J.).  Both Denton and George have told investigators that they worked for Carmichael as part of his drug-distribution operation, and it appears that Denton and George played substantial roles in the alleged criminal activity at issue here.  Perhaps more importantly for assessing the possible materiality of impeachment evidence about them, it appears that they will be important witnesses against Carmichael.  Thus, it is likely that impeachment evidence about Denton or George would be material to Carmichael's defense.

The court must modify its inquiry with respect to the agents pictured on Carmichael's site, DeJohn, Whittle, Halasz, and Greenwood.  Obviously, the court should not ask about their role in the criminal activity; rather, it makes sense to ask about their role in the investigation of Carmichael.  The greater their role, the more likely it is that impeachment evidence about them will be material to Carmichael's defense.  The court is not aware of Whittle and Greenwood's role in the investigation of Carmichael.  DeJohn was very involved in the investigation, however; from what appears in the record, he made the initial contact with George and Denton, and he supervised the search of

Williams's residence. Halasz appears in the record as the agent who arrested Carmichael in November 2003. Accordingly, the court finds it conceivable—albeit very unlikely—that if information came in from Carmichael's website about DeJohn or Halasz, it would be material to Carmichael's defense.

### c. The Government's Interest

The court addressed the government's interest in protecting its witnesses and agents above and concluded that the evidence in this case does not show that Carmichael's website poses a serious and imminent risk to either.[54]

As with the court's discussion of Carmichael's First Amendment rights, the court finds that the protective order sought by the government is not warranted.

### IV. CONCLUSION

This case presents a conflict between, on the one hand, the government's interests in protecting the safety of its witnesses and agents and in enforcing the law, and, on the other hand, Carmichael's less tangible constitutional interests in free speech and preparing his defense. Put another way, the government has argued that if Carmichael's site stays up, physical harm could come to witnesses and agents and the government could be inhibited from enforcing the law in the future, while Carmichael has argued that, if the site is taken down, his rights will be violated. The court has thus been asked not only to weigh very dissimilar interests but to predict the likelihood that future events will implicate those interests.

As professors Rotunda and Nowak have observed in writing about the constitutionality of prior restraints on speech, this posture creates an incentive for the court to over-predict the danger posed by Carmichael's website.[55] If the court permits the site to remain up and a witness or agent is harmed, the court will be blamed for predicting incorrectly. However, if the court restricts or prohibits Carmichael's site, few will even be able to judge whether the court predicted accurately because the site will no longer be available in the same form, if at all. Thus, the safest course for the court is to over-predict the danger posed by Carmichael's site. Indeed, when confronted with a conflict between the public safety and an individual's rights, it is almost always going to be most comfortable to err on the side of public safety.

The antidote to this incentive is to examine rigorously the government's claim that Carmichael's website poses a threat. The court has done this and concludes that, while the website certainly imposes discomfort on some individuals, it is not a serious threat sufficient to warrant a prior restraint on Carmichael's speech or an imposition on his constitutional right to investigate his case. This court appreciates the discomfort that attends involvement in matters of public controversy, but it is bound to weigh the interests of all parties.

The court emphasizes, though, that a few differences in Carmichael's site could have changed the court's calculus. Nonetheless, for the reasons discussed above, the government has not made its case that the protective order it seeks is warranted.

Accordingly, it is ORDERED that the renewed motion for a protective order, filed by the government on April 27, 2004 (doc. no. 181), is denied.

---

54. *See supra* pp. 1295–1296.

55. 4 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* 320–21 (3d ed.1999).

APPENDIX

# WANTED

## Information on these Informants and Agents

**Robert Patrick Denton**
(Informant)

**Sherry D. Pettis**
(Informant)

**Gary Wayne George**
(Informant)

**Wallace Salery**
(Informant)

(Picture Coming)
**Raymond David DeJohn**
(Agent)

(Picture Coming)
**Devin Whittle**
(Agent)

(Picture Coming)
**Thomas Halasz**
(Agent)

(Picture Coming)
**Robert Greenwood**
(Agent)

**If you have any information about these** informants and agents, regardless of **how insignificant you may feel it is.**
Please contact :

Attorney Steve Glassroth: (334) 263-9900

Attorney Ron Wise: (334) 260-0003

Attorney Wesley Pitters: (334) 265-3333

Attorney Elizabeth Anthony: (205) 930-5900

**If incarcerated, please call collect.**

*(Please note: This web site, or any posters, and advertisements concerning the Carmichael Case, is definitely not an attempt to intimidate or harass any informants or agents, but is simply to an attempt to seek information. The Carmichael Case will not be a "closed door" case. Pictures (when available), names and testimonies of informants, agents and witnesses will be on television, on the web site, on radio and published in newspapers. Mr. Carmichael maintains his innocence and wants the public to know all the facts as well as the all the parcipants in this case).*