WR-83,719-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 9/14/2015 3:49:15 PM
Accepted 9/14/2015 4:05:58 PM
ABEL ACOSTA
CLERK

**No. WR-83,719-01**

IN THE

TEXAS COURT OF CRIMINAL APPEALS

SITTING AT AUSTIN, TEXAS

_____

**IN RE STATE OF TEXAS EX REL. ABELINO REYNA,**

*RELATOR*

_____

A PETITION FOR WRIT OF MANDAMUS

CAUSE NO. 10-15-00235-CR

FROM THE 10TH COURT OF APPEALS DISTRICT

WACO, TEXAS

CAUSE NO. 2015-1955-2

FROM THE 54TH JUDICIAL DISTRICT COURT OF

MCLENNAN COUNTY, TEXAS

_____

**STATE'S BRIEF**

_____

*Oral argument is not requested*

ABELINO "ABEL" REYNA
Criminal District Attorney
McLennan County, Texas
State Bar No. 2400087
219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
abel.reyna@co.mclennan.tx.us

i

## Identity of Parties and Counsel

**Relator**
Abelino "Abel Reyna,
Criminal District Attorney
McLennan County, Texas

**Real Party in Interest**
Hon. Matt Johnson,
Presiding Judge
54th Judicial District Court of
McLennan County, Texas
501 Washington Avenue, Suite 305
Waco, Texas 76701

**Respondent**
Court of Appeals, Tenth District
501 Washington Avenue, Suite 415
Waco, Texas 76701

**Real Party in Interest**
Matthew Alan Clendennen

**Real Party in Interest' Trial and Appellate Attorney**
Mr. F. Clinton Broden
2600 State Street
Dallas, Texas 75204

**State's Trial Attorneys**
Mr. Mark Parker
Mr. Brandon Luce
Assistant Criminal District
Attorneys
219 North 6th Street, Suite 200
Waco, Texas 76701

**State's Attorneys on Appeal**
Abelino 'Abel' Reyna
Criminal District Attorney

Sterling Harmon
Appellate Division Chief
219 North 6th Street, Suite 200
Waco, Texas 76701

# Table of Contents

**Identity of Parties and Counsel** ............................................................. **ii**

Table of Contents ....................................................................................... iv

TABLE OF AUTHORITIES................................................................................vii

Statement of the Case ..................................................................... viii

Statement of Jurisdiction .................................................................. viii

Issues Presented ....................................................................................... ix

Statement of Facts ...................................................................................1

Summary of Argument ............................................................. 4

Argument:  Criminal Applicability of *Davenport* ........................... 4

*Davenport v. Garcia* .......................................................... 4

Decisional Basis of *Davenport* ................................................... 5

Limited Applicability of *Davenport* ............................................. 6

A Proper Standard for Criminal Cases ........................................ 8

Argument:  Sufficiency of Findings and Propriety of the

   Tenth Court of Appeals' Grant of Mandamus Relief .................... 8

Constitutionality of the Gag Order ......................................... 9

Narrowly Tailored................................................................ 9

Restrictions Imposed by the Gag Order ..................................... 10

Findings in Support of the Restrictions ...................................... 11

Least Restrictive Means ......................................................... 14

Threshold Standard ………………………………………………………… 15

Conclusion ……………………………………………………………… 18

Prayer …………………………………………………………………… 18

Certificate of Compliance …………………………………………… 19

Certificate of Service ………………………………………………….. 20

# TABLE OF AUTHORITIES

**State Constitutional Provisions**

*Texas Const. Art. 1, §8* ……………………………………………………… 5, 6, 8
*Texas Const. Art. 1, §10* …………………………………………………… 6, 15
*Texas Const. Art. 5, §5* …………………………………………………… viii

**Federal Constitutional Provisions**

*United States Const., Amend. 1* …………………………………………… 14
*United States Const., Amend. 6* …………………………………………… 15

**Federal Opinions**

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) ……………………………….. 9
*Gentile v. State Bar of Nevada*, 501 U.S. at 1054 (1991) ……………………. 18
*Nebraska Press Ass'n v. Stuart*, 427 US. 539 (1976) ………………………… 14
*Procunier v. Martinez*, 416 U.S. 396 (1974) …………………………….. 10, 14
*Richmond Newpapers, Inc. v. Virginia*, 448 U.S. 555, 576,
    110 S.Ct. 2816, 65 L.Ed. 3d 973 (1980) ………………………………….. 12
*Sheppard v. Maxwell*, 384 US. 333 (1966) ……………………………. 14, 17
*United States v. Brown*, 218 F. 3d 415 (5th Cir. 2000) ………………. 8, 10, 17
*United States v. Carmichael*, 326 F. Supp. 2d 1267
    (M.D. Ala. 2004) ……………………………………………… 7, 9, 15

**State Opinions**

*Alvarez v. Eighth Court of Appeals of Texas*, 977 S.W. 2d 590
    (Tex. Crim. App. 1998) …………………………………………………. vii
*Ater v. Eighth Court of Appeals*, 802 S.W.2d 241
    (Tex. Crim. App. 1991) …………………………………………… vii
*Davenport v. Garcia*, 834 S.W. 2d 4 (Tex. 1992) ……….viii, 4, 5, 6, 7, 8, 15, 17
*In re Benton*, 238 S.W. 3d 587 (Tex. App – Houston [14th Dist.] 2007) … 8, 9
*In re Graves*, 217 S.W. 3d 744 (Tex. App. – Waco 2007) … 3, 8, 15, 16, 17, 18
*In re Houston Chronicle Publishing Company*, 64 S.W 3d 103
    (Tex. App. – Houston [14th Dist.] 2001) ……………………………….. 17

**Statutes**

*Texas Code Crim. Proc. Art. 4.04* ………………………………………… viii

*Tex. R. App. P. 9.4(e)* …………………………………………….. 19

*Tex. R. App. P. 9.4(i)* ………………………………………… 19

*Tex. R. App. P. 9.4(i)(1)* …………………………………………19

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

## STATEMENT OF THE CASE

This petition for writ of mandamus and arises out of a criminal prosecution for the offense of Engaging in Organized Criminal Activity, alleged to have been committed by Matthew Alan Clendennen, the real party in interest. *See Appendix 1.* The Respondent in this original proceeding is the Honorable Court of Appeals, Tenth District of Texas, the "Court of Appeals." Abelino "Abel" Reyna, "the Criminal District Attorney," who is the Relator herein, seeks relief from the action of the Court of Appeals' action below, namely: the conditional grant of a petition for writ of mandamus directing the Judge of the 54th District Court to vacate its gag order issued in this cause on June 30, 2015.

## STATEMENT OF JURISDICTION

This Court has jurisdiction and authority to issue a writ of mandamus. *See Tex. Const. art V, §5*; *Tex. Code Crim. Proc. art. 4.04*; *Alvarez v. Eighth Court of Appeals of Texas*, 977 S.W. 2d 590 (Tex. Crim. App. 1998). Writ of mandamus to this Court is the exclusive remedy from an adverse ruling in an original mandamus proceeding in the court of appeals. *Ater v. Eighth Court of Appeals*, 802 S.W.2d 241, 243 (Tex. Crim. App. 1991).

## ISSUES PRESENTED

The Court has designated the following issues to be briefed:

1.  Is the Texas Supreme Court's holding in *Davenport v. Garcia*, 834 S.W. 2d 4 (Tex. 1992), applicable to gag orders in criminal cases?

2.  Are findings supporting the gag order in this case sufficiently specific?

3.  Is the Tenth Court of Appeals' conditional grant of mandamus relief supported by the law and facts of this case?

**STATEMENT OF FACTS**

On May 17, 2015, a shootout between rival criminal gangs erupted at the Twin Peaks restaurant in Waco, McLennan County, Texas. *Appendix 1*. Nine people died in the shootout and many were wounded. *Id*. Clendennen was apprehended at the scene, wearing distinctive signs or symbols indicating association with a criminal gang. *Id*. Clendennen was arrested pursuant to warrant for the felony offense of Engaging in Organized Criminal Activity. *Id*. Details of the incident reported in the press showed that in addition to the nine deaths, eighteen subjects were wounded. *Appendix 5, Video File D*. Five identified outlaw biker gangs participated in the melee. *Appendix 5, Video File B*. In the wake of the violence, there was a heavy traffic of outlaw biker gang members traveling to the Waco area, and law enforcement intelligence had discovered that a "green light" had been given by certain criminal organizations to take retribution against law enforcement and/or members of rival gangs. *Id.* One hundred seventy-seven persons were charged with Engaging in Organized Criminal Activity out of the event, and one hundred fifty-one firearms were recovered from the crime scene. *Appendix 5, Video File E*.

Clendennen sought an examining trial regarding the charged offense, as reflected in *Appendix 2*. On June 22, 2015, Clendennen procured a subpoena *duces tecum* under the instant cause number in the 54th District Court, seeking "any and all videos of the events taking place at Twin Peaks

in Waco, Texas from May 17, 2015—May 26, 2015 desired as evidence in said above numbered and entitled cause." *Appendix 3, Exhibit "A."*

In response to the subpoena, the State filed a Motion to Quash and for Protection of Evidence and Motion to Issue "Gag" Order for all parties. *Appendix 3*. The State attached as an exhibit to its Motion, a copy of a news report wherein Clendennen's counsel expressed his intent to publicize the video if it was released. *Appendix 3, Exhibit "B."* Hearing on the State's motion was held in the 54th District Court on June 30, 2015. (RR I).

In arguing for the release of the video, Clendennen's counsel questioned whether it was "appropriate for [the State] to go on television and represent what's on the video, have the police represent what's on the video. But for Mr. Clendennen not be able to see the video, that – that boggles my mind." (RR I – 20). Clendennen further complained that "the Associated Press has seen this video. The Associated Press has reported on this video. So, the DA wants the press to have copies but not the defendants who have to defend themselves to have copies." (RR I – 201-21).

In response, the State pointed out that pretrial public release of the video could taint witness recollections because, "If everybody gets to see the video right now, we'll have no idea of knowing what they're telling us, if they remember that, if they saw it, or if they watched the video and they're describing what happened on the video." (RR I – 24). Countering the State's argument, Clendennen complained that the Waco Police

Department had posted video of an unrelated offense on its Facebook page the day it happened. (RR I – 26).

The court denied the State's Motion to Quash, but announced, "I want to place a protective order on that video. And I do not want it disclosed in any way to anyone other than counsel for the defense, the defendant, and any experts …." (RR I – 26-27).

The State proposed to the court that it issue a gag order binding both the State and Clendennen. (RR I – 27). The court expressed concern about "causing a problem with the jury pools in this matter." (RR I – 27). Clendennen claimed that due to numerous press conferences and interviews previously given by State agents, the State had already "tainted the well," and "opened the barn door on this case." (RR I – 27-28). Claiming reliance on the Waco Court of Appeals opinion in *In re Graves*, 217 S.W. 3d 744 (Tex. App. – Waco 2007), Clendennen argued merely that a gag order would not be appropriate. (RR I – 28).

Citing concerns about ongoing publicity in the matter, the court announced it would issue the gag order applicable to both the State and the defense. (RR I – 29-30). A copy of the gag order appears in *Appendix 4*.

Clendennen filed an action with the Tenth Court of Appeals, seeking a Writ of Mandamus to vacate the gag order. On August 7, 2015, the Tenth Court of Appeals issued its opinion conditionally granting a Writ of Mandamus, directing that the Writ would issue if the Judge of the 54th District Court did not vacate the gag order within seven days. *Appendix 6.*

Opting not to provide discussion or analysis, the Tenth Court found that the trial court abused its discretion, based on the Tenth Court's opinion in *Graves*.

**Summary of Argument**

1. The Texas Supreme Court's holding in *Davenport v. Garcia*, 834 S.W. 2d 4 (Tex. 1992) is not applicable to gag orders in criminal cases.

2. The findings supporting the gag order in this case are sufficiently specific.

3. The Tenth Court of Appeals' conditional grant of mandamus relief is not supported by the law and facts of this case.

**Argument: Criminal Applicability of *Davenport***

***Davenport v. Garcia***

The Court has directed briefing on the issue of whether the Texas Supreme Court's holding in *Davenport v. Garcia*, 834 S.W. 2d 4 (Tex. 1992) is applicable to gag orders in criminal cases. While Texas courts have followed *Davenport* in assessing the propriety of criminal case gag orders, continued reliance on *Davenport* is not appropriate.

*Davenport* was a civil toxic tort case. *Davenport* at 5. The gag order in *Davenport* prohibited any public comment or discussion of the litigation with anyone not involved in the necessary course of business of the case, and counsel were directed to advise their clients of the order's applicability to each of them. *Id.* at 6. The trial court's sole finding made in support of the gag order was that "conflicts between counsel and the parents of the

4

minor children were resulting in miscommunications with the parents of the children and with the media and general public. *Id.* at 6-7.

**Decisional Basis of** *Davenport*

In analyzing the propriety of the gag order, the Texas Supreme Court considered only "whether the court's gag orders violate the guarantee of free expression contained in article I, section 8 of the Texas Constitution, which provides in pertinent part:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege…."

*Id*. at 7.

Reviewing the historical basis for the constitutional provision, the Supreme Court concluded that "in some aspects" the Texas free speech provision was broader than the First Amendment. *Id.* at 8. The presumption provided a preference that a speaker be sanctioned after, rather than before, the speech occurs. *Id.* at 9. The presumption "in all cases under section eight is that pre-speech sanctions or 'prior restraints' are unconstitutional." *Id.*

Reiterating previous holdings that a prior restraint would be permissible only when essential to the avoidance of an impending danger, the Supreme Court adopted the following test: a gag order in civil judicial proceedings will withstand constitutional scrutiny only where there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just

5

resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *Id.* at 10.

**Limited Applicability of *Davenport***

In reaching its decision, the Texas Supreme Court specifically declined to consider the applicability of the United States Constitution to the issue. *Id.* at 11. As a civil holding, the *Davenport* decision confines itself to gag orders issued in civil cases. *Id.* at 10. It makes no pretensions to resolve conflicts between free speech rights protected under article I, section 8; and the rights afforded to the accused under article I, section 10 of the Texas Constitution and the Sixth Amendment of the Federal Constitution.

Justice Hecht, in his concurring opinion, noted this shortcoming in the Court's decisional process:

> The second difficulty with the Court's view that we should define fundamental constitutional rights without interference from outside the state is that it is premised on a one-dimensional view of those rights which is rarely accurate. If relator were constitutionally entitled to say whatever she pleased, this would be an easy case. But her right to speak freely is not absolute, under either the First Amendment or article I, section 8. In this case, relator's right conflicts with the district court's interest in protecting minor litigants, and the issue is whether the district court's interest warrants the restriction imposed on relator's right. This tension among competing rights and interests gives constitutional construction a multi-dimensional aspect. Thus, the Court's view that federal constitutional rights, which states cannot diminish, are a "federal safety net" is overly simplistic. Federal constitutional construction does not merely set minimum standards for protected rights which the states are free to increase; it strikes a

balance among competing rights and interests that is itself of constitutional significance. While states have more latitude in adjusting this balance than they do in reducing guaranteed protections, that latitude is not unlimited. State courts are not free from federal constitutional considerations in determining fundamental rights. The delicate balance among those rights and other interests must also be maintained.

*Id.* at 43.

A related consideration not taken into account in *Davenport* are the options available to a criminal court in adopting "least restrictive means," when the range of those means may be limited by considerations of constitutionally-guaranteed trial rights of an accused.

In determining the propriety of gag orders, federal circuits have recognized three different threshold standards for imposing a prior restraint. These three standards were analyzed in *Unites States v. Carmichael*, 326 F. Supp. 1267 (M.D. Ala. 2004). The three standards are (1) the speech at issue presents a "clear and present danger" or a "serious and imminent threat" to a fair trial, (2) a "substantial likelihood of material prejudice," and (3) a "reasonable likelihood" of prejudice. *Carmichael* at 1293. The *Davenport* court opted for the highest and most restrictive of these standards, requiring that "an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute," before a gag order is justified. *Davenport* at 10.

**A Proper Standard for Criminal Cases**

*Davenport* should be limited to civil cases because, in reaching its conclusions, the *Davenport* court gave no consideration to the constitutional right of a criminal defendant to a fair and impartial jury. Applying the "imminent and irreparable harm" standard to criminal cases means that the jury pool must be tainted before a gag order may issue. The lowest threshold standard of a "reasonable likelihood" of prejudice is the minimum countenanced by the First Amendment, and does not take into consideration Texas precedent regarding article I, section 8. The standard enunciated by the Fifth Circuit in *United States v. Brown*, 218 F. 3d 415 (5th Cir. 2000) of "a substantial likelihood of material prejudice," takes into account both constitutional trial rights of defendants as well as free speech rights. *See In re Benton*, 238 S.W. 3d 587, 595 (Tex. App. – Houston [14th Dist.] 2007).

## Argument: Sufficiency of Findings and Propriety of the Tenth Court of Appeals' Grant of Mandamus Relief

In the case at bar, the Tenth Court of Appeals conditionally granted mandamus relief, finding that the trial court abused its discretion based on the Tenth Court's opinion in *In re Graves*, 217 S.W. 3d 744 (Tex. App. – Waco 2007, orig. proceeding). Thus, a determination of whether the trial court's findings were sufficiently specific to support the issuance of the gag order would be dispositive in assessing whether the Tenth Court of

Appeals' conditional grant of mandamus relief was supported by the law and facts of this case.

**Constitutionality of the Gag Order**

In his petition to the Tenth Court of Appeals, seeking a Writ of Mandamus, Clendennen claimed three bases challenging the propriety of the gag order:  1) The order violated Clendennen's right to free speech; 2) The court's findings in support of the gag order were insufficient to establish that pretrial publicity had risen to a level posing imminent and severe harm to a fair and impartial trial; and 3) that the gag order was not the least restrictive means to prevent any identified harm.  *Appendix 7.*

In considering the propriety of a gag order, three factors are addressed.  First the court must consider whether the order is narrowly tailored.  *In re Benton*, 238 S.W. 3d 587, 593 (Tex. App – Houston [14th Dist.] 2007) *quoting United States v. Carmichael*, 326 F. Supp. 2d 1267, 1293 (M.D. Ala. 2004).  Next, it must be determined whether the gag order is the least restrictive means or if less burdensome alternatives would achieve the same objective.  *Id*.  Finally, the "threshold standard for imposing a prior restraint" is applied.  *Id*.

**Narrowly Tailored**

Trial courts have an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity.  *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S. Ct. 2898, 61 L.Ed. 2d 608 (1979).  The beneficiaries of this duty include not only the defendant in a given trial, but other defendants as

9

well, such as co-defendants in the same case or defendants in related cases whose fair trial rights might be prejudiced by the extrajudicial statements of other trial participants. *United States v. Brown*, 218 F. 3d 415, 424 (5th Cir. 2000). The limitation on First Amendment rights must be not greater than is essential to the protection of the particular governmental interest involved. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed. 224 (1974).

**Restrictions Imposed by the Gag Order**

The restrictions imposed by the gag order are quoted as follows:

"Accordingly, in its sound discretion and in light of the relevant facts and circumstances of this particular case, the Court ORDERS, ADJUDGES and DECREES that prior to and during the trial of this case

1. All attorneys involved in this case shall strictly adhere to the letter and spirit of the provisions of the Texas Code of Professional Responsibility governing comments to the media. Specifically, all attorneys shall refrain from making "extrajudicial statements that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." TEX. DISCIPLINARY R. PROF'L CONDUCT 3.07
2. All attorneys, their staffs, and law enforcement officers involved in this case shall not discuss this case with the media.
3. Witnesses shall not discuss this case with the media when they have *previously* given statements:
   a. to law enforcement personnel,

10

b.  to representatives of the District Attorney's Office; or

c.  who have testified in investigative or adjudicative proceedings.

4.  Witnesses who give statements to law enforcement personnel, representatives of the District Attorney's Office, or who testify in investigative or adjudicative proceedings *after the date of entry* of this order shall not discuss this case with the media.

5.  This Order shall not be interpreted to prohibit attorneys from communicating with the parties in order to prepare for trial, nor shall it be interpreted to prohibit the third parties from attending any live sessions before the Court or from publishing any information they have already obtained or may obtain in the future.  The term "third parties" includes any person or organization, not a party, not an attorney for a party, or not a person employed by the parties or attorneys for the parties for the purpose of assisting in this litigation.

This Court shall entertain reasonable requests to modify this Order as the need arises."  *Appendix 4.*

## Findings in Support of the Restrictions

The court related the facts and circumstances surrounding the case which justified the gag order restrictions:

"This Court takes judicial notice of
1)  the unusually emotional nature of the issues involved in this case;
2)  the extensive local and national media coverage this case has already generated; and
3)  the various and numerous media interviews with counsel for the parties that have been published and broadcast by local and national media.

The Court FINDS that counsels' willingness to give interviews to the media would only serve to increase the volume of pretrial publicity.

The Court FURTHER FINDS that if counsel for the parties continue to grant interviews to the media, the pre-trial publicity will interfere with the defendant's right to a fair trial by an impartial jury.

The Court FURTHER FINDS that no less restrictive alternative means exists to treat the specific threat to the judicial process generated by this pre-trial publicity.

The Court FURTHER FINDS that an order restricting extra-judicial commentary by counsel for the parties is necessary to preserve all venue options and a delay in the proceedings would not lessen the publicity generated by this case." *Appendix 4.*

The order did not affect the rights of the press to have access to or report on proceedings. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576, 110 S.Ct. 2816, 65 L.Ed. 2d 973 (1980).

In "taking judicial notice of the unusually emotional nature of the issues involved" and the "extensive local and national media coverage this case has already generated," a brief review of what was commonly known through press reports and legal filings at the time of the hearing would be appropriate.

On May 17, 2015, a gun battle erupted at the Twin Peaks restaurant in Waco, Texas. Nine people were killed and eighteen were wounded. The incident occurred in the early afternoon at an eating establishment located in a popular shopping center. The participants in the incident were members and associates of the Bandidos and the Cossacks, two identifiable

12

criminal street gangs.  One hundred seventy-seven people were charged with Engaging in Organized Criminal Activity as a result of the incident. All the accused were identified on the scene as gang members due to wearing distinctive symbols consistent with identifiable criminal gangs.  A large number of weapons, including over one hundred firearms, were recovered at the scene.  In the aftermath of the event, law enforcement intelligence learned that a "green light" had been given by the leadership element of one or more criminal gangs to engage in criminal acts directed toward law enforcement or members of rival gangs.  These facts are supported by materials presented in the Appendix.

In support of the court's finding of "counsels' willingness to give interviews to media," is a copy of a news item wherein Clendennen's counsel's plan to release evidentiary videos to the media is revealed.  This was appended to the State's Motion to Quash, and is included in the Appendix.  In his Appendix presented with his Mandamus application to the Tenth Court of Appeals, Clendennen also provided a copy of a lengthy media interview of the McLennan County Criminal District Attorney.

The enormity of the event at Twin Peaks may be unique in the number of victims, the number of co-defendants, the level of violence, and its effect on a local community.  In determining the propriety of the gag order, it would behoove this Court to compare the underlying facts of this case with those of the cases cited in the parties' briefs presented to the Tenth Court. The scale of the Twin Peaks incident dwarfs those of the cited cases.  The

trial court was justified in imposing all of the restrictions contained in the gag order.

There was imminent harm shown that Clendennen's counsel intended to release evidentiary surveillance videos. It can be gleaned from the hearing record and Clendennen's briefs filed in this case and in the Tenth Court mandamus action that the intent was to counter what Clendennen's counsel believed to be biased statements from State agents previously made to the media. On this basis the court prohibited all counsel from discussing the case with the media. This provision was tempered by the provision allowing for modification of the order upon reasonable request.

**Least Restrictive Means**

In *Nebraska Press Ass'n v. Stuart*, 427 US. 539, 96 S.Ct. 2791 2791, 49 L.Ed. 2d 683 (1976), the Supreme Court opined that a trial court's decision whether to issue a gag order calls for a judgment as to whether other precautionary steps will suffice. This requirement comports with the First Amendment principle that restrictions on speech should employ the least restrictive means possible. *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed. 2d 224 (1974). Several alternatives were suggested in *Sheppard v. Maxwell*, 384 US. 333, 86 S.Ct. 1507, 16 L.Ed. 2d 600 (1966). These include change of venue, jury sequestration, "searching" *voir dire* and "emphatic" jury instructions. In light of the sheer scale of the Twin Peaks incident, it seems self-evident why such less-restrictive options would not be workable. As of this writing, there is a potential of one hundred seventy-

seven jury trials being held for the Twin Peaks defendants. Over five thousand venirepersons would be required to seat juries in these cases (accounting for 2,124 jurors and 3,540 peremptory strikes). The rights afforded these accused under article I, section 10 of the Texas Constitution and the Sixth Amendment of the Federal Constitution stand to be affected by the pretrial publicity in the instant case. The number of cases wherein venue might have to be changed, the number panelists who would need to be screened through *voir dire,* and the number of jurors who might be sequestered show the unreasonableness of these options.

**Threshold Standard**

The third consideration in a gag order analysis is the application of the "threshold standard for imposing a prior restraint." *Carmichael* at 1293. The Tenth Court of Appeals has adopted the standard enunciated in *Davenport*, that a gag order will pass state constitutional scrutiny only if there are specific findings supported by evidence that (1) an imminent and irreparable harm to the judicial process will deprive litigants of a just resolution of their dispute, and (2) the judicial action represents the least restrictive means to prevent that harm. *In re Graves*, 217 S.W 3d 744 (Tex. App. – Waco 2007).

In *Graves*, the Tenth Court found that the gag order issued in that case did not recite sufficiently specific findings to support the order. *Graves* at 752-753. The findings the trial court judge made in that case were:

1. The prior proceeding in this cause of action, and other related actions of which the Court takes judicial notice;
2. The pre-trial publicity which has already occurred in this cause, which includes local and national newspaper coverage, of which the Court takes judicial notice;
3. The rulings and opinions which set out the inherent power of the Court to control its own proceedings, and to assure that a fair trial is provided for the State and the Defendant in this cause.

*Graves* at 746.

There was no finding of any detriment caused by pretrial publicity, or that further publicity would affect fundamental rights of the parties. In short, there was nothing shown that justified a limitation on First Amendment rights. In comparison with the trial court's finding in *Graves*, the findings in the case at bar are specific as to the effects of prior publicity, the intrusion on the right to a fair trial made by such publicity, and the evident intent of the parties and their counsel to continue to make inflammatory extrajudicial statements and release evidentiary matters to the media.

It is noteworthy that in *Graves* the Tenth Court recognized that a trial court could take judicial notice of pretrial publicity affecting the case. *Graves* at 751. However, judicial notice was problematic in the *Graves* case, due to the fact that the trial court judge never afforded Graves the opportunity to be heard on the matter. *Graves* at 752. This is one of the factors that differentiates *Graves* from *In re Houston Chronicle Publishing Company*, 64 S.W 3d 103 (Tex. App. – Houston [14th Dist.] 2001). Otherwise,

16

the Tenth Court took favorable regard of the *Houston Chronicle* case
regarding judicial notice of pretrial publicity:

> In the *Houston Chronicle* case, the Court of Appeals observed that the
> trial court had taken "judicial notice of the 'emotional nature' [of the
> case] and 'extensive local and national media coverage'" and held that
> the trial court's findings were "supported by judicial notice of obvious
> circumstances." *Houston Chronical Pub'g*, 64 S.W. 3d at 109. The local,
> state, and national media storm surrounding the Yates case is well
> documented.

*Graves* at 752.

While the *Davenport* standard requires specific findings to support a
showing of potential harm and the reasonableness of the gag order
restrictions, it is not required that the court explicitly discuss and reject
each of the *Sheppard* options before imposing a gag order. *See Brown* at 431.

The findings in support of the gag order in the instant case track the
findings of the trial court in *Houston Chronical*, which the Fourteenth Court
of Appeals found to be proper. They are more concise and applicable to
the constitutional issues at play than the findings the Tenth Court was
dealing with in *Graves*. The *Graves* decision noted the lack of specificity in
the trial court's findings. The *Houston Chronicle* decision found that the
trial court's findings were sufficient to support a gag order. The trial court
in the instant case issued its order based on findings that were closely akin
to those reviewed in *Houston Chronicle*, and which would have presumably
passed muster with the Fourteenth Court. These findings, being more
complete and comprehensive than those reviewed in *Graves*, should also

presumably have been acceptable to the Tenth Court. This is the position that the State holds in the case at bar. But at the very least, the lack of analysis by the Tenth Court leaves trial courts and litigants in the dark as to whether the standards for a gag order are higher or different in the Tenth Court of Appeals District than they are in other parts of the state.

**Conclusion**

It is only the occasional case that presents a danger of prejudice from pretrial publicity. *Gentile v. State Bar of Nevada*, 501 U.S. at 1054, 111 S.Ct. 2720, 115 L.Ed. 2d 888 (1991) (Kennedy, J., concurring). The enormity of the Twin Peaks cases puts them into this category. At stake are fair trials for one hundred seventy-seven people, and justice for nine dead. As such, in the event that this Court finds that the trial court's order is lacking, the State would reiterate its plea made in its brief below that it heed the advice of Chief Justice Gray in his dissent in *Graves*, "to allow the trial court the opportunity to meet the requirements of their opinion before a fair trial … is put in jeopardy." *Graves* at 754.

**Prayer**

For the foregoing reasons, the State of Texas prays that this Honorable Court affirm the trial court's issuance of the gag order in this case, issue a Writ of Mandamus directing the Tenth Court of Appeals to vacate the conditional Writ of Mandamus previously entered by that Court, and prays for such other and further relief as may be provided by law.

Respectfully Submitted:
**ABELINO 'ABEL' REYNA**
Criminal District Attorney
McLennan County, Texas

/s/ Abelino 'Abel' Reyna
**ABELINO 'ABEL' REYNA**
McLennan County
Criminal District Attorney
219 North 6th Street, Suite 200
Waco, Texas 76701
[Tel.] (254) 757-5084
[Fax] (254) 757-5021
[Email]
abel.reyna@co.mclennan.tx.us
State Bar No. 24000087

## Certificate of Compliance

This document complies with the typeface requirements of *Tex. R. App. P.* 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of *Tex. R. App. P.* 9.4(i), if applicable, because it contains 3,451 words, excluding any parts exempted by *Tex. R. App. P.* 9.4(i)(1).

# Certificate of Service

I certify that I caused to be served a true and correct copy of this Petition

by electronic service or email or hand delivery on:

Respondent, 10th Court of Appeals Waco, Texas by hand delivery per request of Chief Justice Tom Gray

Attorney, F. Clint Broden, for Real Party in Interest, Matthew Clendennen at clint@texascrimlaw.com

Real Party in Interest, Judge Matt Johnson, 54th District Court, McLennan County Texas at matt.johnson@co.mclennan.tx.us

DATE: 9/14/15                               /S/ ABELINO 'ABEL' REYNA
                                            ABELINO 'ABEL' REYNA